OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY,

AND PREROGATIVE COURT,

MARCH TERM, 1888.

———————

THE MAYOR AND COMMON COUNCIL OF CITY OF NEWARK, appellants,

*v.*

JOHN P. STOCKTON, ATTORNEY-GENERAL, et al., respondents.

1. A charitable use, derived from the public, vested in trust in a municipality, it also being the beneficiary, may be transmuted to other municipal purposes with the sanction of the legislature.

2. If the trustee of a charitable use be about to alienate or transform the property so as to carry into effect, in the most reasonable manner, the object of the grant, such act will not be enjoined.

———————

On appeal from a decree of the Chancellor, whose opinion is reported in *Stockton* v. *Newark, 15 Stew. Eq. 531.*

The facts of this case will be found fully stated in the opinion of the Chancellor.

*Mr. Joseph Coult,* for appellants.

*Mr. Cortlandt Parker,* for respondents.

The opinion of the court was delivered by

BEASLEY, C. J.

For the purpose of perspicuity it is necessary to define the *status* of those who appear upon the record as the promoters of this proceeding.

The bill purports to be exhibited as an information by the attorney-general, at the instance of sundry private prosecutors; and yet, although wearing that plainly public aspect, it was sought to sustain the suit, in part, on the basis of the existence of purely private rights of property. The prosecutors, both in the bill and in the arguments of their counsel, were presented to the court as the descendants and heirs of the "old settlers of Newark," whose bodies rest in the burying-ground in question, and it was contended that these "old settlers" and the prosecutors, by privity of blood, were the owners of the disputed premises for the purposes of sepulture.

But this position is conspicuously untenable. If it were well founded it would, *in toto,* confound the present procedure, for the attorney-general, in view of such a case, would have no place in it; the suit, of itself, would fall to pieces for want of coherence between its incongruous parts.

But, in truth, when we look beneath the surface of the case, there does not appear the least semblance of private ownership in these parties. The claim was founded on the fact that the deed from the proprietors vests this property as a place of burial in trust for the "old settlers" of Newark, it being averred that such "old settlers" were a definite class of persons, and the court was referred to the town records, where they were named.

But this construction is based on an unwarranted assumption;

it treats the description of the *cestuis que trust* as a fixed number of individuals, as much so as though designated by name. Such an interpretation seems illegitimate, for it converts the phrase "old settlers" into the entirely different phrase of "first settlers." If we could go outside of the terms of the deed and look for the intention of the parties, the inference would be strongly against the idea that the purpose was to give the benefit of the grant to the original founders of the town alone. The first inhabitancy appears to have occurred about the year 1666, and this trust deed was taken in 1696, and it cannot, therefore, reasonably be presumed that it was the design of those who were inhabitants at this later period to invest those of the earlier period with the entire benefit of the land thus acquired. Such inhabitants might well understand that the expression "old settlers" embraced them as well as those settlers who had somewhat the precedence of them in point of time.

The truth is, this description of the *cestuis que trust* in this instrument, instead of being thus demonstrative of a fixed class of persons, is, in fact, so indefinite as to its beneficiaries as to raise grave doubts with respect to the legal efficacy of the grant itself. Regarding the conveyance as an attempt to create either a private estate or a public charity, the intended recipients of the beneficial interests must, in the first case, be demonstrably certain, and, in the latter, capable of ascertainment. But who can say who the "old settlers of Newark" were? Were they those who became inhabitants during the first month of the settlement, to the exclusion of those who became such during the second month? Or does the description embrace those who settled there in the first year, but not the incomers of the next year?

But it is not necessary further to press this inquiry, for it is certain that if these prosecutors had succeeded in establishing that their ancestors, being a definite number of ascertained persons, together with their heirs, were meant to be the exclusive beneficiaries of this use of the property in question, they would have demonstrated the absolute worthlessness of this deed from the proprietors. It is very plain that, when land is conveyed in fee to certain persons and their heirs, to be used forever as a burial-

place, thereby a charitable use is not created. In order to constitute such latter interest the objects of the gift must be indefinite. It has been said that a public charity begins where uncertainty in the recipients begins. *2 Perry on Trusts* § *687*. Such gifts are sustained for the reason that they enure to the public benefit. But a donation to certain named persons and their heirs is altogether a private concern, to be tested and regulated by the ordinary rules of law. When land is devoted forever to a use that the law recognizes as a charitable one, the transaction is sanctioned and sustained; but, when so devoted to a private use, it is absolutely repudiated, being deemed hostile to that important rule of public policy that prohibits the fettering of property beyond certain prescribed limits. The language of the books is, that "a trust cannot be created that will suspend the absolute ownership of the property for a longer time than that allowed by law. A perpetual trust cannot be created for an individual and his heirs, in succession, forever; and herein a charity differs, for a trust may be established which contemplates the payment of the income of a certain fund to some charitable purpose forever."

In view of this thoroughly established principle it is clear that there can be found no legal basis for this bill in this claim of a private right in these lands vested in the prosecutors.

Nor is the case in this respect strengthened by the fact that the bodies of the ancestors of these prosecutors were permitted to be buried in this cemetery. Such a circumstance does not confer on the descendants of such persons the right to intervene and prevent the property from being devoted, when necessity or convenience calls for it, to other purposes. The cases are numerous and uncontradictory settling the law in this way, so that it is superfluous to refer to them or to discuss the subject. Many of them have been collected in the brief of the counsel of the respondents.

It was deemed that this branch of the controversy presented no question of difficulty, and it has been thus briefly considered in order to eliminate it from the discussion of the real point that calls for the judgment of this court.

Newark v. Stockton.

The ex-chancellor, who decided the case in equity, expressed the view that the premises in question are devoted to a charitable use, and in this theory this court entirely concurs. The supervening and single question is, whether such use can be abrogated by legislative action, and the lands appropriated to other public purposes.

In order properly to apply such legal and equitable principles as are pertinent, it is necessary to comprehend accurately the juncture of events and facts forming the constituents of the problem to be resolved.

This is the situation : the early inhabitants of the section—which for the sake of brevity will be called Newark—organized themselves into a government. They became a regulated community, introducing, by general consent, such regulations and political apparatus as were necessary to the order and well-being of such an establishment. Being thus a government *de facto*, in that capacity they acquired, by purchase from the Indians, an extensive tract of land, in which were included the premises in dispute. Such acquisition was in part distributed among themselves, in part appropriated to new-comers, and in part devoted to public uses. In the progress of time, becoming dissatisfied with their title, they applied to the Proprietors for its ratification, the result being the making of the conveyance that has given rise to the vexed question in this case. That instrument bears date 10th December, 1696. It is important that its contents should be carefully noted. In the first place it conveys several tracts of land, one being allotted as a parsonage; second, the premises in dispute; which are described as being a small tract of land "allotted for the burying-place ;" third, "a triangle piece, allotted for a market-place ;" fourth, "a triangle piece, allotted for a training-place ;" fifth, another "triangle piece, allotted as a watering-place for cattle ;" and, lastly, "the streets of the said town of Newark, as they are now laid out." The town not being incorporated, the conveyance was to four designated townsmen, in fee, " to the only proper use, benefit and behoof of the old settlers of the town of Newark, their heirs and assigns forever, in common ; granted to be and remain to and for the several uses herein particularly

expressed, and to be appropriated to no other use or uses what-
soever." The instrument is a deed of bargain and sale, and is
for a valuable consideration.

The deed from the Indians had been taken in the name of five
persons described as " townsmen and agents of the English inhab-
itants."

In the year 1713 the inhabitants of Newark were incorporated
by Queen Anne, it being recited in this charter by the applicants
therefor "that their ancestors and predecessors, freeholders of
the said town, by license from the Proprietors' Governor, in the
month of July, 1667, had purchased from the Indians all that
tract of land now known by the name of Newark," &c.

From the foregoing delineation of the title to the lands in
question, it seems to be clear that, when the deed from the Pro-
prietors was taken, the intention was to vest the interest in the
entire body of the inhabitants of the town, and not in a particu-
lar class of such persons. The recital just extracted from the
charter, which is subsequent to the Proprietors' deed, plainly
expresses that understanding.

The next muniment of title we find in this case is the act of
the legislature passed in the year 1804. *P. L. of 1804 p. 255.*
This law recited that the inhabitants of the town of Newark
purchased all the lands in the bounds of the said town from the
Indians; that they parceled out the same, " at the same time re-
serving certain portions of land in various parts of said town for
public purposes; " and that, doubts having arisen in respect to
the Indian title, it was thought advisable by the inhabitants of
said town of Newark to take a grant from the Proprietors, and
that, accordingly, they took such conveyance, but that, " through
the ignorance of those infant times, the use created by the said
grant, although really meant and intended for the benefit of the
inhabitants of the said town of Newark and their successors,
was so inartificially expressed that the town was embarrassed in
asserting its rights in said lands." The statute then proceeds
to divest the estate created by the deed of the Proprietors, and to
transfer it to the inhabitants of the township of Newark and
their successors, declaring " that the estate hereby vested in the

inhabitants of the township of Newark, as aforesaid, shall be appropriated and forever remain to and for the several uses in the said original patent aforesaid expressed, and for no other use or uses whatsoever."

The estate thus acquired by the township became afterwards vested in the city of Newark by force of the provisions of its charter.

There can be no doubt that the city of Newark has thus become invested with an indefeasible title to these lands, holding the same, at present, subject to the use above defined; for, even on the assumption that the statute passing the title was originally inefficacious and void, the premises have been held openly and continuously under it for over eighty years. The title thus established, therefore, must be deemed indisputable. The city holds the fee of the land as a public burying-place, the same being a charitable use.

This being the posture of affairs, the legislature, on the 29th of June, 1886, passed a law whereby it was provided that, when lands are held by cities for burial purposes, and are affected by a trust, they shall be devoted to that use, and when, in the judgment of the common council, the public good will be served by devoting such lands to other public uses, it shall be lawful to use such lands for any public purpose for which, in the judgment of the common council, they are best adapted. The act further directs that in case interments have been made in such lands, the common council shall cause such remains to be removed to some suitable and proper burial-place, and shall make proper provision therefor and for the protection thereof, and to that end may make such reasonable appropriation of public moneys as may be necessary.

The bill charges that, by virtue of this statute, the common council of Newark were proceeding to convert this burying-ground into a public market-place; and it was that course of action that the late chancellor, in the decision embraced in the present appeal, enjoined.

From the foregoing statement of the facts the character of the charitable use now in question will be readily understood. It is

not a gift of land by a private donor devoting it perpetually to a particular public purpose; nor is it a gift for such an object put in charge of a private corporation, but it is property for such an end, purchased by the public and in the hands of the public. The situation is not unlike that which would occur if any city of the state, by force of appropriate legislation, should purchase, out of the public moneys, lands to be devoted forever to the use of a public cemetery. The question is whether the property thus acquired and held by the municipality would be possessed of such a nature as to be under the control of the legislature.

The general principle of law on the subject is that municipal property is subject to legislative authority. When property is put in trust in the hands of such a corporation the effect is to prevent the corporation from perverting, at its own will, such property to other uses; but when the uses are public, and not derived from private grant, they are liable to be modified or changed, with the concurrence of the law-making power. No case has been found that conflicts with this rule. *Montpelier* v. *Montpelier, 29 Vt. 12*, which is the only adjudication cited in the opinion read in the court below, is plainly not in point, for the court, in the decided case, resolved that the statute then in question, properly construed, was not intended to apply to the trust property, and consequently, the power of the legislature to deal with such property was not *sub judice.* The court neither did nor could properly decide whether the trust fund could be turned by statutory authority to other purposes, after declaring that the act under consideration neither had nor was intended to have such effect.

Nor is it deemed that the cases cited in the brief of the counsel of the respondents are more apt. These are four in number, viz.: *Montpelier* v. *East Montpelier, 27 Vt. 704; Dartmouth College* v. *Woodward, 4 Wheat. 518; Harrison* v. *Bridgeton, 16 Mass. 16*, and *Plymouth* v. *Jackson, 15 Pa. St. 44.*

The first of these references has already been commented on; the second seems to be eliminated from the inquiry by a mere advertence to the fact that it relates wholly to the consideration

of the subject of the power of the legislature with regard to the property and franchises of private corporations.

The third citation, that of *Harrison* v. *Woodward,* seems more akin to the subject; but, as it is considered, it is opposed to the contention in aid of which it is vouched. That controversy related to the division of a town. By the terms of the original grant of the township of Bridgeton, one sixty-fourth of the land granted was required to be appropriated for the support of schools, and a like proportion for the support of the ministry, and they were laid out by the proprietors accordingly. In 1805 the town of Harrison was incorporated, being composed, in part, of the towns of Bridgeton and Otisfield. By the act of incorporation it was provided " that all property, rights and credits of the said towns of Otisfield and Bridgeton should be received and enjoyed by the town of Harrison, in certain proportions," and the question was whether a proportionate part of the provision thus made for the ministry passed to the newly-created corporation. The distribution was negatived, but expressly on the ground that the provision for the ministry was not the property of the town, but that it belonged to a particular class, as it would vest in the parishes as they came into existence. There was no question made that the lands, or their proceeds, appropriated by the original charter for the support of schools, could be controlled and distributed by the subsequent legislation. There appears to be, with respect to their legal nature and qualities, no difference between a grant of land for the support of schools in a town and the appropriation of land as a municipal graveyard. They are both charitable uses, and if the former could be disposed of by statute, as appears to have been conceded in the case cited, similarly the latter must be subject to the same authority.

The last of the four decisions above named is also alien in principle to the present inquiry; it belongs to a well-defined class of cases in which the present one is not included. It presents an instance of property devoted to a charitable use in the hands of a private corporation, and which, consequently, by force of the rule established in the Dartmouth college case, was declared

to be impregnable to legislative invasion.    There are a number of decisions resting on this basis.    The line of demarcation between such cases and those in which the trust property is vested in a municipality, is clearly exemplified by two judgments rendered in the state of Maine.    The former of the two is the case of *Yarmouth* v. *North Yarmouth, 34 Me. 411.*    The general principle on which it was settled was similar to the *ratio decidendi* of the Pennsylvania case, just referred to.    But, incidentally, it presents a feature instructive with regard to the topic under consideration.    The case shows these facts : that the town of North Yarmouth owned a tract of land appropriated to the use of schools, and that the legislature then passed an act incorporating certain persons as trustees of this school fund, and authorizing them to sell the land, convert the avails into a fund, and apply the income forever to the public schools in that town " among the several districts in proportion to what they pay of town taxes."

It will be noticed that here was an assumption of legislative power over this property while its title was in the municipal corporation ; arbitrarily, the land was directed to be sold, and the benefits of the use to be distributed in a new ratio.    So far, the legislative action was not deemed questionable, and the case was decided on the supposition that it was a legal exercise of authority.    But when the legislature, having thus created a private corporation and placed this property in its keeping, endeavored by a later statute to regulate its distribution, such enactment was pronounced to be void.    The court draws the distinction, with respect to legislative interference, between a public and private corporation, and declares that these trustees " did not constitute," in the words of the opinion, " a municipal or public corporation, although the object of its creation might have been a public benefit.    Their charter was a grant from the state, partaking of the nature of a contract, which they accepted, and in which the government had no interest."

The case seems an authority for the proposition that, while this property, derived from a public source, was vested in the municipality, it was liable to statutory control, but that, when it

had passed to a private corporation, it was divested of such liability.

The other decision, in the same court, is that of *North Yarmouth* v. *Skellings, 45 Me. 133,* and arose out of the following state of facts : The proprietors of the lands of North Yarmouth had conveyed to certain persons, their selectmen, " all the flats and muscle-beds in said town lying below high-water mark, in behalf of and for the sole use, benefit and behoof of the present inhabitants of said town of North Yarmouth, and of all such as may or shall forever hereafter inhabit and dwell in the said town, to be by said inhabitants forever hereafter used, occupied and improved in common &c."

By an act of the legislature the town of North Yarmouth was divided, and the question was as to the power of the legislature to give, as had been done, to the inhabitants of the new town, the use of these flats and muscle-beds, the court sustained the law on the broad principle stated by Chancellor Kent, that " in respect to public corporations, which exist only for public purposes, as counties, cities and towns, the legislature, under proper limitations, has a right to change, modify, enlarge or restrain them, securing, however, the property for the uses of those for whom it was purchased."

This case is in express terms discriminated, with respect to its governing principle, from the previous case just cited, the court saying, " that it is very apparent, from the reasoning and authorities cited (in that case), that the court would have come to a different result, if the funds, which were attempted to be divided by the legislature, had been in the hands of the town, and not in the hands of a board of trustees."

We think the rule applied in this case is the correct one, and that it never could be invoked with more propriety than in the instance now before this court. This graveyard was obtained by the community for the use of the community ; in the deed by which it was conveyed it is associated with other property obviously to be devoted to municipal uses, such as a site for a public market, a training-ground, and the public streets ; and all these several pieces of land have been regarded and treated

as the public possessions of the city, for the market-place and training-ground have long since been converted into parks, and in 1809, it being represented to the legislature that the watering-place for cattle, embraced in the deed of the Proprietors, had not, for many years, been used for the purposes for which it was originally appropriated, and was not wanted for such use, an act was passed authorizing its sale, and it was sold accordingly by virtue of such authority.   In this same vein no act more significant of the opinion prevailing in regard to the nature of these lands could have been exhibited than the act of the legislature enacted in the year 1804, transferring their title from the trustees to the corporate authorities.

It is undeniable that all these lands comprehended in the Proprietors' conveyance have been dealt with by the public authorities for more than a century past, with the assent of all parties in interest, until the filing of the present bill, as though they were property held in the ordinary way by a public corporation for public use.   No reason is therefore perceived why the city of Newark should be enjoined from turning this cemetery to the beneficial use in contemplation by virtue of the sanction of the recent statute.

The principle thus asserted is important, for the opposite view would imperil large public interests, and seriously embarrass the municipalities of the state in the management of their property. If it were true, as a matter of law, as the Chancellor thought, that this graveyard cannot, even with the assent of the city and of the legislature, be used for any other purpose than that to which it was originally devoted, then the necessary result would be that these other tracts of land embraced in the proprietary grant would be subject to a similar restriction.   By force of the prevalence of that theory the public parks of Newark would be abolished, the one reverting to a market-place and the other to a training-ground; the city would have in its midst a watering-place for cattle, for the sale which has been made of that tract would be plainly illegalized; and none of the original streets, no matter what the necessity, could be narrowed or broadened. And this state of things would continue not for a year or a cycle

of years, but forever. If a rule of law producing such conse-
quences as these existed, its mischief would be equaled only by
its unreasonableness.

Nor do we think the decree appealed from should stand, even
on the theory that these premises came to the city of Newark by
settlement from a private benefactor. Let us assume that the
old settlers of Newark, not as a *de facto* government, but as an
association of individuals, gave this tract of land to be used by
the inhabitants of the city as a burying-place forever—what
would be the legal result under present circumstances? Such a
donation would not be subject to legislative control, for the
interest the beneficiaries would acquire under such a grant would
be equitable property, entitled to the protection of the law. But,
although the present scheme of converting this tract of land to
an alien use could not be carried into effect by means of the
statute which has been enacted for that purpose, in our opinion
the same end could and would be reached through the interven-
tion of the court of equity. The case would be presented of a
charitable use which, from change of circumstances, cannot be
reasonably enjoyed in the mode provided by the settlor. In the
presence of such a situation, the legal principle is unquestion-
able; a court of equity will take the matter in charge, changing,
when necessary, the nature of the donated property, or regulating
the mode of its administration. When the exigency arises a de-
cree will be made that the trust property be sold, as when it has
been shown to be desirable to move to a different location a
church, hospital or school-house. The doctrine is a familiar one.

We think it clear that the present charity, as now conditioned,
would fall within the scope of this authority, and call for its
application. The charity has failed in its main purpose. The
design of the donors was to provide a place of burial, not for one
or two generations of the inhabitants of this city, but for all
future generations. But this cemetery has long since ceased to
be used as a place of sepulture; such a use of it has been and
is now forbidden by law. It is a cemetery of the past—a place
where the bodies of a by-gone generation repose. The question
would be, whether this tract of land should be, for all time to

come, devoted to this limited use. Such, obviously, was not the intention of the donors. The inhabitants of the city, who are the beneficiaries of the charity, through their duly constituted authorities, would stand before the court showing that the devotion of the land to its present purpose is, taken as a whole, not a benefit but a serious detriment to the public, and that it is reasonable to remove the bodies in this yard to a more suitable place to be provided out of the city treasury, and thus effectuate that part of this charity that only is susceptible of being carried out. It is not perceived on what ground a court of equity could refuse to accede to such a prayer; for it does not seem possible that any reasonable person would say that this tract of land, in the most populous part of a large city, should be permitted to remain for all future time, devoted merely to its present use; for to say this would, in effect, be to maintain that a charity will be so carried into effect as to work an injury to its beneficiaries. It seems to us plain that, under the conditions presented, the Chancellor, if he had been properly applied to, would have been bound to permit the designed transmutation of this property.

And if this be so, then the injunction should not have issued, for the court will not enjoin the act of a trustee of a charitable use which itself would have directed to be done, had the case been before it. Such a trustee may alienate the trust property, but he will do such act at the peril of his conduct being disapproved of by the court of chancery. On this head the case of *Attorney-General* v. *South Sea Company, 4 Beav. 453,* is an illustration. Eight messuages were conveyed to trustees, the rents to be applied, by way of certain charitable uses, for the poor of the parish. The trustees leased these properties for ninety-nine years to the South Sea Company, and this was complained of as a breach of trust. But Lord Langdale, defining the power and duty of a trustee of this class, says: "It is plain that, in ordinary cases, a most important part of their duty is to preserve the property, but it may happen that the purposes of the charity may be best sustained and promoted by alienating the specific property. The law has not forbidden the alienation, and this court, upon various occasions, with a view to promote

the permanent interests of charities, has not thought it necessary to preserve the property in specie, but has sanctioned its alienation." And, after remarking that the trustees may do, at their own risk, what the court would have done under the circumstances, and deeming the alienation made by the trustees, on the whole, beneficial, he dismissed the bill.

This, we think, should have been the course in the present case. The Chancellor, even on the theory adopted by him that this charity was not subject to legislative control, should not have enjoined the municipal authorities from doing the act contemplated by them, inasmuch as, if the case had been before him, he would have been constrained, by the force of a principle of equity that is not open to question, to have directed the doing of this same act.

The decree must be reversed, and the bill directed to be dismissed; but, under the circumstances, without costs in either court.

*Decree unanimously reversed.*