### THE TOWN OF NORTH HEMPSTEAD,

v.

### THE TOWN OF HEMPSTEAD.

The towns of this state are bodies politic of special character and limited powers ; and as such, have a capacity to hold property.

The common lands, respecting which they have a right to make regulations, are those which they hold in their corporate capacity.

But a town has no capacity to hold lands not within its own limits.

The title of a town to its lands is held, subject to the power of the legislature over its limits ; and no right of property is violated, by the division of a town.

The original town of Hempstead was invested with power to hold lands, by patents from the early governors of the colony ; and those patents constituted the inhabitants a body corporate.

The division of the original town of Hempstead into two new towns, was in itself, an assignment to each, of such of the lands of the preexisting town, as are included in the limits of each new town, respectively.

This division of the original town, was a partition of its common lands, in fact as well as in title.

**1824.**
October term.

Towns.

THE subject of controversy in this cause, first came before the court, in the cause of Denton and others v. Jackson and others, reported in 2 John. ch. 320 : and a decree was made in the year 1817. That cause was subsequently carried to the court of errors, and that decree was in part reversed, as mentioned by the chancellor, in his opinion in this cause.

See also Mr. Johnson's general index in the 7th volume of his chancery reports, p. 254.

This bill was filed by the town of North Hempstead, for the purpose of presenting their claims, free from the embarrassments which attended the forms of the procedure, in the cause of Denton v. Jackson.

The cause was heard in October term last, and was argued by

MR. EMMET and MR. ROBERT EMMET for the complainants, and

MR. JONES for the defendants.

The opinion delivered by the chancellor embraces so full a view of the cause, that it is thought not necessary to report the very learned and interesting arguments of the counsel.

THE CHANCELLOR. The suit of Denton and others against Jackson and others, reported in 2 John. ch. 320, was dismissed from this court, by the late chancellor, for want of proper parties; and his decree was affirmed by the court of errors. The late chancellor was of opinion, that the lands in question, belong to the town of Hempstead; and that if the town of North Hempstead had any right in these lands, Denton and others, who were complainants in that suit, were not competent to represent or sue for North Hempstead. The court of errors in their decree, declared, that the freeholders and inhabitants of North Hempstead, are entitled to the use, benefit and enjoyment of these lands, in common with the freeholders and inhabitants of the town of Hempstead; but that no relief could be given in that suit. The complainants in this suit, now urge, that the decree of the court of errors, in the suit of Denton against Jackson, has established the title of the town of North Hempstead to these lands; and that the title adjudged by that decree, is no longer open to question.

If the declaration of the court of errors, concerning the rights of the freeholders and inhabitants of North Hempstead, had been made in a suit between the parties now before the court, it might have established a title in the town of North Hempstead. But it is apparent from the context of the decree and the facts of the case, that the court of errors could not

have meant, that the title in question, should never be litiga-
ted between other parties, not before the court in that suit.
The suit of Denton and others against Jackson and others,
was a suit between private persons. Denton and others were
freeholders and inhabitants of North Hempstead, who prosecu-
ted for themselves, and all others having rights similar to their
own. Jackson and the other defendants had or were alleged
to have various different rights, either as private persons or as
freeholders and inhabitants of one or the other of the two
towns. The rights claimed and litigated by the parties in
that suit, were their own rights of property ; and the investi-
gation of their claims, involved an investigation of the rights
of the two towns. But the parties litigant, were private per-
sons, who with full right to litigate for themselves, had no
power to litigate for other persons, or for either of these towns.
The court of errors and the late chancellor concurred in
opinion, that the suit of Denton against Jackson, could not
be sustained, for want of necessary parties ; and this was the
point, which was directly adjudged by both courts. But the late
chancellor having expressed an opinion, that the suit could not
have been maintained, even by any other parties ; the court
of errors dissenting from this opinion, expressed their dissent,
by the clause of their decree, which is now considered.
Neither the opinion of the court of errors, nor that of the late
chancellor, can be considered as an adjudication of the ques-
tion concerning which they differed. Those opinions can not
be so considered, because the rights of these two towns, were
not before this court, or the court of errors, in such a manner,
as to be susceptible of any conclusive adjudication. The
only proposition which has been definitively adjudged, is,
that the complainants in the suit of Denton against Jackson,
had no right which could enable them to maintain that suit.
All other principles advanced either in the court of errors, or
in this court, however entitled to respect, are still, not deci-
sions binding the rights of other parties. To understand the
court of errors as dismissing the case of Denton against
Jackson, for want of proper litigants in the suit, and as defini-
tively adjudging at the same time, the rights of the real and
absent parties to the controversy, is an inadmissible construc-

tion of their decree. This would be to consider the court of errors as violating the great principle of justice, that every party should be heard, before his rights are adjudged. The decree of the court of errors declares in effect, that the parties in the suit before them, had no right to the subject of litigation, because others not parties to the suit, had the rights then in question. Such decisions are often necessary; and they are made, not to establish rights which appear to belong to others, but to decide the pretensions of the parties before the court. Whether the court in such a case, states as a reason for its decision, that the subject of litigation belongs to others or not, the decree binds only the parties to the suit in which it is made, and is not conclusive upon the rights of others. The decree of the court of errors in the suit of Denton against Jackson, binds the parties in that suit; but the established principles of law and justice require, that it should not be conclusive upon strangers to that litigation. The controversy in that suit and the controversy in this, are to a great extent, the same; but the parties are different. The want of necessary parties in that suit, properly prevented any conclusive decision of the merits of this controversy. Here is no absence of necessary parties; the two towns are now the parties; and the merits of the controversy, must now be directly decided. The declaration of the court of errors concerning the rights of the people of North Hempstead, must be regarded, as a reason given in explanation of its decision in the suit of Denton against Jackson; and not as a determination of the rights of the parties in this cause.

The decree of the court of errors in the suit of Denton against Jackson, is not explained by any report of the case, or by any opinion given in that court. The only public report of any of the proceedings of the court of errors in that suit, is a note by Mr. Johnson the late reporter, in 7 Johns. ch. 254, of the general index, in which the reporter states, that he was not able to obtain the reasons of the members of the court, who delivered their opinions; that the grounds of the decision can not be now stated; and that the judges in assigning their reasons, took very different views of the case.

I am therefore of opinion, that the declaration of the court of errors, concerning the rights of the freeholders and inhabitants of North Hempstead, does not establish the title of the complainants in this suit ; and that the rights and pretensions of the parties in this suit, to the lands in question, are now open to determination, upon all their intrinsic merits.

The merits of this controversy, were fully examined by the late chancellor, in the suit of Denton against Jackson ; and I concur entirely in his reasons and his conclusions. Some of his opinions concerning the titles and pretensions of these two towns, were expressed hypothetically ; the preliminary question decided by him, being that concerning the rights of the complainants then before the court. Those opinions are directly applicable to this case ; and I adopt them, as a sound and just exposition of the rights of these towns, to the lands in question. The opinion of the late chancellor, is ample and satisfactory ; and I shall not attempt to repeat ideas, which have been already so well expressed. Adopting his opinions as I do, I might here, close my examination of this cause. In some respects, I shall do so ; but I will also give my own views of the principal questions, which the cause presents.

The towns of this state are in my opinion, bodies politic, under the constitution and the laws concerning the powers, privileges and duties of towns. They are not indeed, declared to be corporations, in the forms and terms, which are usual in special grants of incorporation ; but even in grants to private persons, a body politic may be created, by any terms, which sufficiently express the intention of the creating power. Our towns are civil divisions of our counties ; and they are also much more. They have faculties which belong not to private persons, and which persons can not confer upon themselves, by any voluntary association. They are little republics recognised by the constitution, defined by the laws, and invested with important powers. Their powers are exercised and their municipal concerns are administered, by town meetings, and town officers. They are bodies politic, as cities and states are political bodies ; all differing in the nature and magnitude of their respective powers. A town

must therefore have a capacity to hold property, or at least, such property as may be necessary or proper, for the exercise of its powers and functions. The freeholders and inhabitants of every town, are authorised by law, to make at their town meetings, regulations for the improvement of their common lands. The common lands here intended, must be those of the town in its corporate capacity; for a town can have neither right nor motive, to interfere with the use of the private property of individuals. The authority thus given to the town meetings, to regulate the common lands of the towns, clearly supposes, that there are such common lands, and that the towns have a legal capacity to hold them.

The town of Hempstead was invested with power to hold lands, by the patent from the Dutch governor in 1644, and also by the patent from the English governor in 1685. Both those patents, conveyed the lands within the limits of Hempstead, and constituted the inhabitants of the town, a body corporate, capable of receiving and holding the lands conveyed. Such was the purpose of both patents ; the terms employed in both, express this intention ; and they are not reasonably susceptible of any other interpretation. Both these patents proceeded from the sovereign, a source which had power to grant the title, and also power to create corporations. The lands were intended for the use of the inhabitants of the town ; and the administration of the trust, was committed to the town itself, as a corporate body. It is the sense of these patents, and consistent with all the views which can be supposed to have governed either the grantors or the persons obtaining the patents, that the title of these lands should vest and reside in the town, as a political body ; and that the use, appropriation and division of the lands, should be confided entirely to the town, to take place, according to the progress of population and the wants of its inhabitants. These patents, created the town of Hempstead a corporation, with certain powers ; and one of those powers was, a capacity to hold and dispose of the lands which the patents granted. This construction of these patents, is supported by all the practice of the town of Hempstead, from the times when those patents issued. All the lands within the limits of the town, have either been appropri-

1824.

N. HEMPSTEAD
v.
HEMPSTEAD.

ated to individuals, or have been enjoyed as undivided lands of the town, under its regulations. This practical construction of the title and powers of the town prevailed much more than a century; and even now, it is subject to no dispute, excepting that which has arisen from the division of the town. If a usage so long and uniform, stood alone, it would have the force of prescription; but this usage coincides with the legal effect of the two patents, and the legal powers of towns; and all conspire, to give the same explanation of the nature of this title.

When the original town of Hempstead was divided, two new corporations were established, in the place of one; and each of the new political bodies, had a capacity to hold lands within its own limits. But it seems, that a town has no capacity to hold lands not within its own limits; and a town can not apply the powers of regulation given by law, to lands situated in another town. If these principles are just, the division of the original town of Hempstead, was in itself an assignment to each of the new corporations, of such of the lands of the preexisting town, as are included in the limits of each respective new town. If these principles are not sound, what others are more justly applicable to this case? Was the title of the original town of Hempstead, extinguished, when that town ceased in its primitive identity? This idea can not be entertained. Was the title transferred to the state? The legislature had no such intention. Did these lands remain the property of the original town, after its division? This can not be so. How then, was this title disposed of or affected, by the division of the town? Each new town succeeded to a portion of the lands. Each succeeded by force of the division itself, according to that division and its line, and according to the capacity which each new town acquired to hold land within its limits. The division not only disunited the ancient title, but it severed the lands themselves. The establishment of the two new towns, was not a substitution of two titles in the place of one, to an aggregate of common property; but it was a division in fact as well as in title, of the subject itself, between the new parties; a partition of all the lands, into new and distinct portions. The

right of property acquired by the new towns or either of <span>1824.</span>
them, and the partition of the subject, both equally resulted <span>N. HEMPSTEAD</span>
from the division of the original town ; and the establishment <span>v.</span>
of the two new towns, was as much a partition in fact, as it <span>HEMPSTEAD.</span>
was a transfer of title. Such appears to be the legal effect of
the act dividing the original town of Hempstead into two
towns. But it is said, that this construction involves a vio-
lation of rights of property. The right of a town to its
lands, is a right of a peculiar character. Towns may be
erected, divided or altered in their limits, by law ; they are in
their nature, local communities ; and they hold lands within
their limits, subject to the power of the legislature, over their
limits. It seems to be a condition of the title of a town to
its lands, an essential quality of the title itself, that the lands
belong to the town, only while they remain within its limits.
Such being the nature of the title, which a town has in lands ;
no right of property is violated, when the legislature by di-
viding a town, assigns to one or both of the new towns, such
lands of the preexisting and larger community, as are situa-
ted within the limits of either of the towns newly established.

The fourth section of the law dividing the original town
of Hempstead, provides, that the inhabitants of South Hemp-
stead shall enjoy the right of oystering, fishing and clamming,
in the creeks, bays and harbors of North Hempstead; and that
the inhabitants of North Hempstead shall enjoy the like privi-
leges, in the creeks, bays and harbors of South Hempstead.
This provision sheds a clear light upon the question of par-
tition. It indicates most distinctly, the sense of the legisla-
ture, that the division of the town, was a partition of the
common property of the town. If the right of fishing in all
the waters within the original town, remained a common right
of all the inhabitants of both the new towns, notwithstanding
the division ; this provision would be unmeaning and use-
less. It would declare a right which existed before, and
which without the declaration, would still exist. It would be
a provision utterly superfluous and inoperative. But if the
legislature considered the erection of the two new towns from
one, as involving a partition of the common property of the
original town, it was necessary to reserve from the effect of

the partition, any part of the common property, which was not intended to be divided. This reservation of rights of fishing, like all the other provisions of this law, was probably proposed to the legislature, by those who proposed or assented to the division of the town ; and the reservation accordingly shows, not only the intention of the legislature, but also the sense of the parties, that all the common property of the original town, excepting its rights of fishery, should be apportioned between the new towns by the division. In answer to this argument, it has been urged at the bar, that the right to take fish, is a public right, open to all persons; and that any grant conferring or reserving an exclusive right of fishery, is null. If this doctrine were sound, it would not impugn the conclusion, that this law was intended to be a partition of all the property of the original town of Hempstead, excepting its rights of fishery. The fourth section of this law supposes, in contradiction to the doctrine now advanced, that a right of fishing may be granted ; for if the right to fish in these waters, belonged equally and inviolably, to all mankind, it would be useless to provide, that such a right should be enjoyed by the people of these two towns. But the legislature here meant to dispose of the subject before them, as it then stood. By the English law, a right of fishing may be granted ; all the waters and the right of fishing within the limits of the original town, had been granted by the English governor, in his patent ; and the rights so granted, were a part of the common property of the town. When the town was divided in 1784, the legislature and the parties in interest, regarded the case as it then existed. The right of fishing which had been granted to the town, was an existing pretension ; it was considered and claimed by the inhabitants, as one of their privileges; and it was so treated by this law. The statute provides in substance, that notwithstanding the division of the town, this right may be enjoyed after the division, as it had been enjoyed before : and the fourth section was evidently intended, to except the right of fishing, as it then stood, from the operation of the other provisions of the statute. The inference that all the other common property of the original town, was intended to be divided between the new towns, therefore

stands, in great force. This then was not a case, in which the legislature divided a town into two towns, without knowledge, that the town divided held property. The fact, that the ancient town of Hempstead held valuable rights of property, must have been known to the legislature, as it was known to the parties interested in the proposed division. The legislature acting upon the application of some, and with the acquiescence of all, divided the town, and declared by the act of division, that one particular subject of the common property of the preexisting town, should be enjoyed, as it had been enjoyed before. If the effect of this law, as a partition, were otherwise doubtful, it is illustrated and determined by this provision. Had it been intended, that any other part or subject of the common property of the original town, should be enjoyed after the division, by the people of the two towns indiscriminately, a reservation like that expressly made in respect to fishing, would have been inserted in this law. No other reservation was made; and all which was not reserved from division, was divided.

The law dividing the original town of Hempstead, was enacted, upon an application made to the legislature, for that purpose. The application proceeded from the people of that part of the town, which now forms North Hempstead; and must have been publicly known, in the town proposed to be divided. The line of division between the two new towns, was in all probability, proposed to the legislature, with the like knowledge of all who were interested in the question; and was probably, adopted by the legislature, as it was proposed. The original town of Hempstead was thus divided, upon the express application of some, and with the assent of all, who had rights which could be affected by that measure. This people knew their rights; they knew the situation and value of their undivided lands; they knew the line proposed as the line of division; they knew the lands which would lie in one of the new towns, and those which would be situated in the other; and they knew, that one town could not regulate or dispose of lands lying in another town, as they had been accustomed to see these lands governed and enjoyed.

1824.

N. HEMPSTEAD
v.
HEMPSTEAD.

A division of the original town, could not have been contemplated by them, without regarding it as a measure, which must or might be also a division of the lands of the town; and upon all the facts of this case, it is a reasonable belief, that all who solicited and all who assented to a division of the town, also assented to a division of the lands, according to the boundary between the new towns.

The undivided lands which belonged to the original town of Hempstead, at the time of its division, are situated, partly, in each of the new towns. The quantities of these lands, included within the two new towns respectively, do not appear. It is stated in general, that the portion of these lands included in the present town of Hempstead, is considerably greater, than that comprehended in North Hempstead; and no statement more precise, concerning these quantities, is given. Nothing in this cause, shows the values of the respective portions; and it does not appear, whether these portions are equal or unequal in value. Upon this question, important as it is, the parties and the proofs are silent. If there is a disparity in value, between these two portions, it is a fact not alleged or proved in this cause. As the cause stands, there is no sufficient reason to say, that a partition of these lands between the two new towns, according to the line of division between them, was an inequitable partition, when the town was divided in 1784. Such a partition of all these lands, between the two new towns, may have been equal and just according to all the circumstances of quantity, value, local situation, population and the wants and conveniences of the respective towns, as those circumstances then existed. A partition to be just, should be equal in value, between the joint proprietors, according to their respective rights in the subject. These lands are plains, marshes, meadows, beaches of sand, and lands under water. They are of great extent; the different parts of them, must be very unequal in value; and the beaches and lands covered with water, must be of much less value, than the plains and meadows. The indefinite fact, that the portion of the whole, which is included in one town, is considerably greater, than that which is situated in the other, is a very uncertain foundation for any conclusion, that the portion

which is larger in acres, is of greater value, than that which is less in extent. If these two towns were now to be established, and if these lands were now to be divided between them, upon what principle should a partition be made? Should one half of the lands be assigned to each town? Why should each town be entitled to a moiety? These towns are not equal in territory; and the inhabitants of Hempstead are far more numerous than the inhabitants of North Hempstead. Should the portions to be allotted to the respective towns, be determined by the relative numbers of the inhabitants of the two towns? Or should some other principle of partition, peculiar to the case, be adopted? These questions concerning the basis of an apportionment, between the new towns, must have occurred, when the original town was about to be divided; and the principle by which any apportionment should be made, was then, as it is now, uncertain. The great difficulty of making any partition of these lands, which should be rigorously exact or just, between the two new towns, was apparent, and must have been then considered. The plains are a great part of the lands; and being almost uninhabited, if all the plains had been assigned to either of the new towns, the division of inhabitants between the two towns, would still, have been very nearly the same. But a line passing nearly through the middle of the plains, was selected, as the line of division; and this line was probably adopted, for the purpose of assigning a part of the plains to each new town, in property as well as in limits. A partition of all the undivided lands by a single line, may well have been considered the most simple mode of division; one, which if not entirely accurate, was nearly so; and one, which certainly avoided the difficulties of a minute and exact partition. This division seems at least, to have been satisfactory to the two towns, in 1784, and long afterwards. Both the new towns after their organization, proceeded to treat the lands which had belonged to the deceased town, as having received an actual partition; each new town exercising exclusive dominion and regulation over the portions within its own bounds: and a long series of acts, asserting and admitting exclusive title in each town, has since taken place. So far as an opinion can be formed from

1824.
N. HEMPSTEAD
v.
HEMPSTEAD.

all the facts and circumstances of the case, a division of these lands between the two towns, according to the boundary between them, was an equitable partition in 1784; and if such a partition would not now be equal, it is probably, because the relative values of the two portions, have varied, since that time.

The general conclusions from all these views, are, that the division of the original town of Hempstead in 1784, was a legislative partition of the lands of the town, between the two new towns; that the partition of these lands by the division of the town, must have been within the contemplation and with the assent of those who solicited, and those who acquiesced in the division; and that the partition so made, was not inequitable or unjust, in the state of things which then existed.

Upon the whole case, I am of opinion, that the town of North Hempstead has no title to the lands in the town of Hempstead, of which partition is now sought; and that the suit must be dismissed with costs.