ARNOLD S. GRAHAM, PLAINTIFF, v. THE TOWNSHIP OF EDISON, A MUNICIPAL CORPORATION, THE BOROUGH OF METUCHEN, A MUNICIPAL CORPORATION, BOARD OF EDUCATION OF THE TOWNSHIP OF EDISON, BOARD OF EDUCATION OF THE BOROUGH OF METUCHEN, DEFENDANTS-APPELLANTS, AND THE TRUSTEES OF THE FREE SCHOOLS OF THE TOWN OF WOODBRIDGE, A NEW JERSEY CORPORATION, THE TOWNSHIP OF WOODBRIDGE, A MUNICIPAL CORPORATION, BOARD OF EDUCATION OF THE TOWNSHIP OF WOODBRIDGE, DEFENDANTS-RESPONDENTS, AND THE GENERAL BOARD OF PROPRIETORS OF THE EASTERN DIVISION OF NEW JERSEY, A NEW JERSEY CORPORATION, *ET ALS.*, DEFENDANTS.

Argued November 22, 1960—Decided July 28, 1961.

538

Mr. *John B. Molineux* argued the cause for appellants (*Mr. Christian J. Jorgensen,* attorney for appellants Township of Edison and Board of Education of the Township of Edison; *Mr. Molineux,* attorney for appellants Borough of Metuchen and Board of Education of the Borough of Metuchen).

Mr. *Nathan Duff* argued the cause for respondents (*Messrs. Toolan, Haney and Romond,* attorneys for respondent The Trustees of the Free Schools of the Town of Woodbridge; *Mr. Stanton L. Levy,* of counsel; *Mr. Duff,* attorney for respondent Township of Woodbridge; *Messrs. Foley and Manzione,* attorneys for respondent Board of Education of the Township of Woodbridge; *Mr. Francis C. Foley, Jr.,* of counsel).

The opinion of the court was delivered by

HALL, J. The unusual question posed by this appeal is steeped in New Jersey colonial history. To be determined is the extent of the class presently entitled to the benefit of certain lands laid out "for the maintenance of a free schoole" pursuant to the direction of the original charter of the "Towne and Freeholders of Woodbridge" granted by the proprietors of the colony on June 1, 1669. More specifically the problem is whether the benefit is limited to the public educational purposes of the present confines of the Township of Woodbridge or whether it extends as well to those municipalities and their coterminous school districts, such as Edison and Metuchen, formed in later years in whole or in part out of the larger area which comprised the town as created by the original charter. The Chancery Division decided against the claims of the subsequently formed municipalities.

Procedurally, the matter was decided below by the granting of summary judgment on this facet of the litigation, which had been raised by cross pleadings between the various defendant public bodies. The court directed the entry of

final judgment thereon, *R. R.* 4:55–2, and the case is here on our certification of the ensuing appeal of Edison and Metuchen to the Appellate Division. *R. R.* 1:10–1(a).

The answer to the question presented depends on the nature and incidents of the original designation of these "school lands" and the effect of subsequent events. It is essentially a legal one and, there being no factual dispute, it was resolvable by the summary judgment procedure. The underlying informational elements are found primarily in official records, which were before the trial court, given fuller meaning and understanding by authoritative historical materials,[1] of which we may take judicial notice. 9 *Wigmore, Evidence* § 2567(c), 2580 (*3d ed.* 1940); *McCormick, Handbook of the Law of Evidence* § 325, 330 (1954).

New Jersey was a proprietary colony from the time of its capture from the Dutch as part of New Amsterdam by the forces of Charles II in the early fall of 1666 until the proprietors surrendered all governmental prerogatives to the crown in 1702. Thereafter to 1776 it was a royal province governed by the reigning monarch of Great Britain through an appointed governor. Before the capture Charles II formally granted the whole territory to his brother, James, Duke of York, with full powers of government and complete ownership of the land. *N. J. S. A.,* Acts Saved from Repeal, p. XXXIX. In June 1664, again prior to the Dutch surrender and James' coming into actual possession of the territory, he conveyed

---

[1] 1 *Powell, The Law of Real Property,* ch. 4, Sources of American Law, § 58, New Jersey (1949); *Kemmerer, Path to Freedom: The Struggle for Self-Government in Colonial New Jersey,* ch. I (1940); *Burr, Education in New Jersey 1630–1871,* especially *ch.* XVI, The Sources of The Common School (1942); 1 *Lee, New Jersey As a Colony and As a State,* especially *chs.* VI and XXI (1902); 1 *Myers, The Story of New Jersey,* especially *ch.* XXIII (1945); *Whitehead, East Jersey under the Proprietary Governments* (Collections of the New Jersey Historical Society, Vol. I, 1846); *Dally, Woodbridge and Vicinity* (1873); *Hunt, Metuchen and Her History* (1870).

that portion which is now New Jersey by instrument of release to Lord John Berkeley and Sir George Carteret, their heirs and assigns forever, as sole proprietors.[2] *N. J. S. A.,* Acts Saved from Repeal, *p.* XLIII. The name of New Jersey was then given to the area. They appointed Philip Carteret, a relative of George, as governor of the colony.

The territory comprising New Jersey was a wilderness in 1664 except for a few settlements by the Dutch across the Hudson from New Amsterdam and one or two along the Delaware. To attract settlers and stimulate colonization, moved no doubt by hopes of ultimate personal profit, Berkeley and Carteret, some 11 months after the grant from James,

---

[2] In 1676 Berkeley and Carteret divided the proprietorship into East and West Jersey, Carteret becoming the owner of East Jersey in which Woodbridge is located. Subsequently their respective interests were conveyed to others and at the time of the surrender of governmental authority to Queen Anne in 1702, East Jersey had 24 proprietors holding in common the land which had not been conveyed in the preceding 38 years. The surrender expressly recognized the continued ownership of the land in the proprietors, thus forming the basis for all land titles in New Jersey. Defendant The General Board of Proprietors of the Eastern Division of New Jersey, composed of the succeeding holders of the shares of the 24 proprietors, is the successor in title of Carteret and his grantees and remains the owner of all land in what was East Jersey not previously conveyed by it or its predecessors. See *Proprietors of Eastern Division of New Jersey v. Force's Executors,* 72 *N. J. Eq.* 56 (*Ch.* 1896); *Arnold v. Mundy,* 6 *N. J. L.* 1, 65 (*Sup. Ct.* 1821); 13 *New Jersey Practice (Lieberman, Abstracts and Titles)* §§ 1641, 1642.

Some early questions arose concerning the title of the proprietors by reason of land purchases made directly from the Indians and succeeding grants thereof made by the Governor of New York before he learned of James' separation and conveyance of New Jersey to Berkeley and Carteret. Such matters are of no legal consequence as far as Woodbridge is concerned, however, because the early settlers obtained a bargain and sale deed for the whole area from the successors in interest of the Indian purchase in December 1666 after their contract with the proprietors in May of that year (shortly to be mentioned) and prior to the proprietors' charter of the town two and a half years later. It seems clear that it was recognized from the beginning that all land titles in the town derived from the proprietors pursuant to the contract and charter.

signed and published their "Concessions and Agreement of the Lords Proprietors of the Province of New Caesarea or New Jersey, to and with all and every the Adventurers and all such as shall settle or plant them." *Leaming and Spicer, Grants and Concessions,* 1664–1702 (1758; *Honeyman reprint* 1881) *p.* 12. See *N. J. S. A.,* Acts Saved from Repeal, *p.* X. Although perhaps intended more as an ancient advertisement to attract settlers, it quickly came to be regarded by the beneficiaries as the first constitution of the province. It was a most liberal document indeed for those early times. A form of government for the colony was prescribed reposing executive duties in the appointed governor and his council, and the legislative branch in an assembly of representatives elected annually by the freemen of the colony, with power to make laws and levy taxes. A very considerable amount of individual freedom was tendered. We need be concerned only with the provisions relating to the laying out of lands, important because they form the basis of authority for the Woodbridge charter. The general theme was free land. Individual adventurers were offered substantial acreage for settlement during the initial years. Broadly speaking, the governor was empowered to lay out land in large lots or in towns, townships, villages and the like, and issue warrants and register surveys therefor in the name of the proprietors. The latter reserved unto themselves one-seventh of the lands laid out, with the remainder to be subject to an annual quit rent to the proprietors of not more than one penny per acre, first payable in 1670. The proprietors also offered to grant land for highways and streets in cities, towns and villages, for churches, forts, wharfs, harbors and "publick houses" and to each parish for the use of their ministers 200 acres, all such lands to be free of rents, taxes and other charges. The scheme outlined was one not only of proprietary ownership and disposition of the land but also set forth the form of

government itself to be established by the proprietors both as owners of the soil and the representatives of the crown.[3]

Among the areas in which the proprietors circulated their Concessions to attract settlers was New England and in May 1666 Governor Philip Carteret entered into a contract for Berkeley and Carteret with a group of residents from that section which has come to be called "Articles of Woodbridge and Piscataway Men." It was therein agreed that the signatories and their associates might settle one or two townships, each six or eight miles square and consisting of 40 or 100 families more or less, between the Rahway and Raritan Rivers and that settlement was to begin between the date thereof and the next November. They were given the right to admit their own inhabitants and to lay out and allot each settler's proportion of land among themselves, reserving two lots of 500 acres in each town to the proprietors for their disposition (in lieu of the one-seventh part specified in the Concessions). The individual allotments were to be patented by survey and recordation in the provincial office. It was further provided that in matters of worship, liberty of conscience was to be granted, but that in each town 200 acres should be allowed for the maintenance of the ministry as well as land for the building of a church, church yard and all other public uses, to be exempt from the payment of property taxes or the quit rent of a half penny per acre. The instrument guaranteed in general the same individual rights and obligations set forth in the Concessions and specified that each town would have a charter granted to it (presumably when enough families had settled) to be a

---

[3] Considerable acrimony shortly developed between the proprietors and settlers in many places which continued until 1702. Perhaps the former's performance did not always match the promises of the Concessions and their authority in governmental matters was questioned. But, as far as Woodbridge was concerned, there seems no doubt that at the time of the 1669 charter the proprietors had the unquestioned right to lay out and assign land and were in fact the fountainhead and only source of public authority.

corporation and in which would be set forth a form of local government.

Settlement of the area by New Englanders thereafter began and the general boundaries of the town of Woodbridge were surveyed. Apparently the minimum number of families for a charter was not obtained at once for the articles were extended from time to time and the charter was not granted "to the Towne and Freeholders of Woodbridge" by the proprietors until June 1, 1669. Piscataway, to the west, was similarly chartered.

The charter created the municipal corporation or township called "by the name of Woodbridge" and described its area by metes and bounds, comprising some six miles square and 23,040 acres exclusive of waste land and highways and bounded by Arthur Kill, the Rahway River, the Piscataway line and the Raritan River. Excepted therefrom was Amboy Point (the central portion of the present City of Perth Amboy), which the proprietors selected as the 1,000 acres reserved to them in the agreement. Included in the chartered area were not only the present Township of Woodbridge, but also the Boroughs of Carteret and Metuchen and porttions of the Township of Edison, City of Rahway and City of Perth Amboy.

The freeholders of the township were empowered to admit other inhabitants and divide the land by majority vote, with allotments to be surveyed and recorded with the Recorder General of the province within three years from the charter date and to be subject to the quit rent. Lands not so patented within the three-year period would revert to the proprietors. A rather full form of local government, including a local court, was also specified, as well as the rights, privileges and obligations of the citizenry. The pattern was that of a pure democracy functioning by the periodic town meeting of all freeholders and freemen.

Of basic significance to the issue before us is the following charter provision:

"4thly. That They have power by the pluralitie of voices of the Freeholders and freemen of the said corporation to choose their owne minister or ministers for the service of God and administring of His Holy Sacraments, and being so chosen, inducted and admitted, all persons as well as the Freeholders, as others the freemen and inhabitants admitted in the said corporation or township shall contribute according to their estates for his maintenance, towards which charge there shall be two hundred acres of good upland and meadow laid out, to the use and behoof of the said minister, *and one hundred acres more for the maintenance of a free schoole*, which said Land shall not be allionated, but shall remaine from one incumbent to another for ever. Which said land *together with the land for the building of a* church, church-yard, *school-house*, market-place and the like shall be exempted from paying the Lords Rent of a halfe penny pr. Acre, or any other rate or taxes whatsoever for ever. Notwithstanding it shall and may be Lawfull for any of the said Freeholders and inhabitants aforesaid that are of a different judgment in matters of Religion to maintaine any other minister or ministers at their own Cost and charges without being molested or disturbed for the same." (Emphasis added)

A little more than two years later, under date of September 10, 1671, Governor Carteret issued a patent granting to the "freeholders of the Towne and Corporation of Woodbridge," their heirs and assigns forever, all land within the town boundaries which had not yet been patented. The freeholders (defined as all those who had actually patented their lands or would do so before March 21, 1672, the first day of the new year under the old calendar) were empowered to dispose of such lands as they or the majority of them, their heirs and assigns, "shall judge best and most comodious and beneficial for the convenience and best advantage of the whole society of freeholders," provided that all lands appointed for public use should first be laid out. This instrument apparently had the effect of giving up any reverter to the proprietors of land not patented pursuant to the charter within three years of the date thereof.

The school lands were not laid out until the town meeting directed such action in 1701. The metes and bounds description was then entered in the town book in the office of the clerk. As a matter of fact it was much later discovered that

the area described actually contained about 163 acres on the ground. The bulk of it remains today, allowing for some conveyances to be mentioned and difficulties in locating boundaries because of disappearance of reference points in the ancient description, as farm or vacant land upon which is located a farm house and outbuildings. All is within the present confines of the Township of Woodbridge except for a small sliver extending into Edison. The 200 acres of ministry lands were also laid out.

It will be noticed that the charter provision for the laying out of land for the maintenance of a free school, *i. e.*, land the income from which was to be used for maintaining a public school, as well as the reference to other land upon which the schoolhouse itself would be built, is not found in the prior documents. One can well imagine that it was insisted upon in the final charter by the settlers from New England because of their background and prior experience in the matter of education. In the Massachusetts and Connecticut colonies from earliest times public education was considered a necessity and township schools were established, lands reserved to support them and their management and support undertaken by the town through the town meeting. This was in contrast with the view of education in other colonies, and indeed in other parts of New Jersey,[4] where even into the 19th century education was thought of largely as allied to religion and a function of the church and the ministry rather than a matter of right to all children and of official community responsibility. The concept of the common school was one of the great contributions of the New England emigrants to New Jersey, and Burr (*op. cit., p.* 227) tells us that "Woodbridge is an admirable

---

[4] For example, in neighboring Perth Amboy, settled by many heterogeneous groups, the first school was connected with St. Peter's Episcopal Church and the rector was the city's first schoolmaster. *McGinnis, History of St. Peter's Church, p.* 35 (1956).

illustration of the typical features of the New England township school system."

So we find that early in Woodbridge's history the freeholders, through the town meeting, were actively engaged with educational matters. School teachers were elected (unconnected with the church), their salaries fixed and taxes levied to make payment thereof. The location of the school lands in the common lands was generally agreed upon at an early date but, as has been indicated, was not surveyed until 1701. In the same year ten rods of land were laid out elsewhere upon which to build a schoolhouse and one was erected. Prior thereto the school appears to have been held in the meeting house, probably the only building of sufficient size. A second school building was constructed within a few years in the Rahway section of the town. During the first century management of the school lands was entrusted to committees appointed by the town meeting. The records show that by 1766 the fund realized from rent of the property totalled over 500 pounds.[5] See *Dally, op. cit., pp.* 177–184. Apparently, however, difficulties were encountered which led to the next step in the factual chronology pertinent to the question before us.

In 1769 the Freeholders of the town petitioned the provincial governor to incorporate "The Trustees of the Free Schools of the Town of Woodbridge," because they found themselves unable and without authority properly to settle accounts with the persons appointed to receive the rents and issues of the school lands, to prosecute persons who committed waste and trespass thereon, to build a schoolhouse, to make provision for proper teachers "and to make and ordain proper laws and instructions for the good governing of the Said Schools." The governor granted and issued the charter

[5] It is interesting to note that in 1717 the town meeting resolved to sell the school lands, as "More Conveinient & advantagious," but found that an order of the colonial assembly was essential to render the sale valid. Two citizens were appointed to petition the assembly to pass such an act, but the action was never carried out.

incorporating the then trustees (presumably a school committee appointed by the town meeting) and their successors under the quoted corporate name. Full power was given to acquire, hold and sell or otherwise dispose of real and personal property, with the right to sue and be sued and the specific authority to demand and collect moneys arising out of the school lands received by persons previously appointed. Plenary power was also granted to engage teachers and to promulgate all orders and direction necessary for the government of the schools. Provision was made for the election of trustees by the town meeting every three years.

The document appears to create what would amount, in modern times, to a board of education for the then town of Woodbridge.[6] To what extent it managed and ran the schools themselves we are not advised. Certainly it has not done so for many years, since the present township school district has long since had a board of education pursuant to the state education law. But the corporation created in 1769 continues to exist (it is a defendant-respondent herein) and to this day has exercised complete dominion and management over these school lands. The trustees have been and are elected by the voters of Woodbridge Township. We are informed that they have rented the property from time to time. It was used for some period as the township poor farm, under what financial arrangements we do not know. Although the charter does not deal with legal title to the land or expressly vest it in the corporation, we think that is immaterial since the granted powers of dominion are complete. Apparently pursuant thereto, the corporation has granted pipe line easements now held by companies who are defendants in this suit, and to the Township of Woodbridge itself. About two acres of the land were condemned years ago for railroad purposes by a company which is also a

---

[6] Separate district boards of education or school trustees were apparently not provided for in New Jersey after statehood until the common school act of 1829. See *Burr, op. cit., pp.* 251–252.

defendant herein. In 1949 the Trustees conveyed about 30 acres to the State for use as part of the Garden State Parkway. Our information is, although the record is very sparse on the matter, that rental income received has been used for maintenance of the property and distributed from time to time for educational and allied purposes within the then limits of Woodbridge. This phase of the situation is of no present significance, however, because it is not contended that the manner or beneficiaries of such past distributions have any substantive bearing on the issue before us.

Specific reference should be made to the other municipalities or portions thereof taken over the years from the territory of the original town of Woodbridge. In 1784 a part became the north ward of the City of Perth Amboy. When the City of Rahway was created in 1858 (*L.* 1858, *c.* 58), a portion of Woodbridge was included therein. The Township of Raritan (now called Edison) was created by *L.* 1870, *c.* 313, out of Woodbridge and Piscataway. The Borough of Metuchen came into existence in 1900 (*L.* 1900, *c.* 57), its territory coming from that portion of Raritan Township which had originally been part of Woodbridge (no part of the school lands is located in Metuchen). The present Borough of Carteret (originally called Roosevelt) came into being under *L.* 1906, *c.* 101, entirely from Woodbridge territory. From the evidence before the trial court it does not appear that, in the settlement of assets and liabilities between Woodbridge and these later created municipalities, any consideration was given to the matter of the school lands, although, in the case of Raritan in 1870, an accounting was made with respect to personal property located thereon, the lands then being used as the Woodbridge Township poor farm. (It was not until 1898, *L.* 1898, *c.* 15, that this State had any general statute dealing with the disposition of public real property when a new municipality was created out of an old one. Acts of incorporation of new municipalities prior to that date appear only to have dealt with division of personal property. The present statute,

like that of 1898, provides that any such real estate belonging to the old municipality "shall be and remain the property of the municipality within whose limits it may lie after separation." *R. S.* 40:43–18.) We have not been referred to any legislation affecting the lands or the incorporation of the trustees since the 1769 charter and, as far as the present record shows, there has been no prior litigation involving the school lands or the Trustees.

The present suit came about in this way. In December 1955 the Trustees entered into a contract to sell the school lands, or the greater portion thereof, to a manufacturing company for $275,000. Plaintiff, a Woodbridge taxpayer and resident, then instituted the action, joining as defendants all the parties which we have previously mentioned, including the subsequently formed municipalities. The proposed sale was attacked as illegal and beyond the powers of the Trustees and the price was claimed to be grossly inadequate. Cancellation of the agreement of sale was sought. (This portion of the suit became moot because the vendee was unable to obtain title insurance, resulting in an avoidance of the contract.)

The complaint went on to ask for a determination of "the nature and purpose of the trust for which said lands have been dedicated"; a declaration of the location and quantity of the lands dedicated for the maintenance of the free school and the persons or corporations for whose benefit such dedication enures; a determination whether the Board of Proprietors has any interest in the lands, by reason of the tract's containing 163 acres instead of 100 acres specified by the charter, or otherwise; a declaration that the purpose of the trust will be better accomplished by a sale of the lands under direction of the court and investment of the proceeds; and an accounting by the Trustees of the assets in hand and the administration of the trust property. Cross pleadings between the defendant public bodies asserting their respective claims of rights in the lands led to the summary judgment motion with respect thereto made by the Trustees, the Town-

ship of Woodbridge and its Board of Education against the other parties.[7]

We are satisfied, on the basis of the historical facts which have been summarized and the conclusions to be drawn therefrom, that the school lands were factually and legally public lands at inception and continue so to be. The situation is, of course, a peculiar one, since it arose on the original settlement of a previously uncivilized and unorganized area. As has been indicated, the proprietors not only owned the soil but were, at least for the purposes here involved, the only governmental authority. There can be no doubt of their power to create and endow units of local government and to distribute the land as they saw fit. The express direction in the charter of the town thereby created to lay out the land for the maintenance of a free school ripened, when it was physically set aside, into legal title in the then municipal corporation. As such it was held in trust, as is all public property, for the designated purpose.

And that purpose was a public one. Since a free school in Woodbridge was always a governmental function and operation for the benefit of all and not a more or less private enterprise for the benefit of a certain class or segment of the community, the town itself was the beneficiary rather than the inhabitants, or some of them, as individuals. To use the terminology of trusts, it was a public charitable use, with a public grantor. Legally the situation does not differ from that which would exist if the town had purchased the land from a private owner for this purpose.

This conclusion of the nature of such a grant in this State is dictated by the instructive opinion of Chief Justice Beasley in *Newark v. Stockton,* 44 *N. J. Eq.* 179 (*E. & A.*

---

[7] The briefs indicate the claims of the Board of Proprietors have been settled. Since the Board has not participated in this appeal we assume it no longer asserts any interest in the school lands. As far as the appendix before us shows, the issues beyond the matter of the contract of sale and the instant question remain undetermined in the trial court.

1888). That case involved land in Newark conveyed by the proprietors by deed in 1696, the tract involved being specified therein to be "the burying-place," which was used for many years as the public cemetery for the town. Newark had been settled about 20 years earlier on territory which the original settlers acquired by purchase from the Indians, with the permission of the proprietors' governor. They had no prior charter or direct grant from the proprietors and for many years the settlement was not incorporated. The land was laid out and some of it, including the tract in question, designated for various common and community purposes. To confirm title to the occupied area, the 1696 deed was secured. Because the town was not incorporated, the conveyance ran to four designated townsmen in fee for the benefit "of the old settlers of the town of Newark, their heirs and assigns forever, in common." In 1713 the town became incorporated through a royal charter. By a statute passed in 1804, the Legislature divested the estate created by the proprietors' deed and transferred it to the inhabitants of the town for the uses expressed in the original patent. Title thereby became vested for the first time in the municipality. See *City of Newark v. Watson, 56 N. J. L.* 667, 672 (*E. & A.* 1894). Chief Justice Beasley held, on this less persuasive state of facts than in the instant case, that the city held the fee of the land as a public burying place, which was a public charitable use subject to control and change of use by subsequent state legislation. (The decision upheld the validity of a later state statute authorizing the city government to devote such burial lands to other public purposes and to remove the remains interred therein to another suitable burial place.) He pointed out, by way of illustration, that there was no difference, with respect to legal nature and qualities, between appropriation of land as a municipal graveyard and a grant of land from the proprietors for the support of schools in a town.

We do not think this legal status of the school lands was in any wise altered by the 1769 charter incorporating the

Trustees. Under modern concepts, it is a legally odd document and must be considered as *sui generis*. It will first be noted that this charter was granted by the provincial governor, the executive, rather than by the legislative assembly and there is no indication of any enabling legislation. There can be no question, however, at this late date, that at least a *de facto* public corporation came about and has functioned for almost 200 years, unchanged by any subsequent legislation or otherwise, in accordance with the powers granted. There is no express vesting of title to the lands in this body and we are not called upon to decide whether there was an implied transfer from the municipality. As previously stated, we consider this to be immaterial in view of the complete dominion over the land given to the incorporated trustees. More important for present purposes, we see no intent to or accomplishment of change of the beneficiaries. No significance is to be attributed to the recital in the instrument that the petition seeking it was by the "Freeholders" of the town, for at that time the term encompassed a public body in the sense of those entitled to vote and therefore govern the municipality through the town meeting. Further in this connection it will be recalled that the 1669 town charter was granted to "the Towne and Freeholders of Woodbridge." We are of the opinion that after the incorporation of the Trustees the property was still held on the same public charitable use and that the new body in effect constituted primarily a managerial mechanism.

This brings us to the effect of the subsequent creation of the new municipalities. The underlying principle was again laid down in *Stockton* where the court, applying the general rule that municipal property is subject to legislative authority, held that the uses of lands of this type and origin, where such uses are public and not derived from private grant, may be "modified or changed, with the concurrence of the law-making power." 44 *N. J. Eq.*, at *p.* 186. In other words, public property originating in these ancient grants was to be treated no differently in this respect from munic-

ipal property acquired for public use by any other means.
While *Stockton* did not involve the division of the grantee
municipality, we find no reason why the same principle should
not apply and these school lands, which we have found to
be public lands in the full sense, treated in the same fashion
as any other public real property upon the creation of new
municipalities out of the territory of the original town.

■■ It is, of course, elementary that, as part of its gen-
eral authority over its creatures, the Legislature may, sub-
ject to constitutional restrictions, divide a municipality,
even without the consent of the original municipality or its
people, and, in connection therewith, provide for a division
of the property of the original municipality between the
remaining and the new municipality. *Rhyne, Municipal
Law,* § 2–47 (1957). As has been said, New Jersey had no
general statute providing for the disposition of public real
property in such event prior to 1898 and the special acts
incorporating Perth Amboy, Rahway and Raritan Township
(Edison) made no mention of the matter. Therefore, the
common law on the subject prevailed. *Inhabitants of Bloom-
field Township v. Borough of Glen Ridge,* 55 *N. J. Eq.* 505
(*E. & A.* 1897).

There were seemingly two conflicting views at common law.
37 *Am. Jur., Municipal Corporations,* § 40, *p.* 657. One
held that all public real estate continued to be the property
of the original municipality, whether physically situate in
it or in the split-off, new corporation. *City of Winona v.
School District No.* 82, 40 *Minn.* 13, 41 *N. W.* 539, 3 *L. R. A.*
46 (*Sup. Ct.* 1889) is perhaps the leading case. The other
view reached the conclusion that the municipality in which
the particular public real property lies after the separation
becomes the owner thereof. Representative decisions are
*Laramie County Com'rs v. Albany County Com'rs,* 92 *U. S.*
307, 23 *L. Ed.* 552 (1876); *Town of Mount Pleasant v.
Beckwith,* 100 *U. S.* 514, 25 *L. Ed.* 699 (1880); *Town of
Cassian v. Town of Nokomis,* 254 *Wis.* 94, 35 *N. W. 2d* 408,
410 (*Sup. Ct.* 1948). The latter is the rule adopted by our

1898 statute and the question is thereby settled in this State with respect to municipal separations after that date.

■ Even under the second view, the title and all beneficial interest in these school lands remained in Woodbridge after the creation of Raritan Township (Edison) in 1870 and since, except the sliver physically situate within the present boundaries of Edison. (None of the land is located within any of the other new municipalities.) Consequently, in order to determine the rights in the Edison sliver, we must decide which common law view New Jersey followed prior to our statute. We can find no definitive adjudication. There appear to be only two decisions in which the matter was mentioned by way of *dictum*. *Inhabitants of Bloomfield Township v. Borough of Glen Ridge, supra* (55 *N. J. Eq.* 505), in the Court of Errors and Appeals, leans very strongly to the first view. *Inhabitants of Lodi Township v. Hackensack Improvement Commission,* 60 *N. J. Eq.* 229 (*Ch.* 1900), a decision of the Court of Chancery in 1900, three years after *Bloomfield,* speaks the other way, citing *Town of Mount Pleasant v. Beckwith, supra,* but failing to mention *Bloomfield.* We feel constrained to accept the view of *Bloomfield,* which results in a holding that the benefit of the whole of the school lands is limited to the public educational purposes of the present confines of the Township of Woodbridge.

We have not been unmindful of numerous old decisions in other jurisdictions which have been brought to our attention involving the disposition of various kinds of ancient common lands, or the proceeds thereof, upon various forms of division of the original grantee municipality. *The Trustees of the New Gloucester School Fund v. Bradbury,* 11 *Me.* 118 (*Sup. Jud. Ct.* 1834) ; *Inhabitants of Yarmouth v. Inhabitants of North Yarmouth,* 34 *Me.* 411 (*Sup. Jud. Ct.* 1852) ; *Inhabitants of North Yarmouth v. Skillings,* 45 *Me.* 133 (*Sup. Jud. Ct.* 1858) ; *Inhabitants of Harrison v. Inhabitants of Bridgeton,* 16 *Mass.* 16 (*Sup. Jud. Ct.* 1819) ; *Town of Greenville v. Town of Mason,* 53 *N. H.* 515 (*Sup.*

*Ct.* 1873) ; *Town of North Hempstead v. Town of Hemp-stead,* 2 *N. Y. Ch. Rep.* 425, 1 *Hopk. Ch.* 288 (*Ch.* 1824), affirmed 2 *Wend.* 109 (*Ct. Err.* 1828) ; *Plymouth v. Jack-son,* 15 *Pa. St.* 44 (*Sup. Ct.* 1850) ; *Town of Montpelier v. Town of East Montpelier,* 27 *Vt.* 704 (*Sup. Ct.* 1854) ; *Town of Montpelier v. Town of East Montpelier,* 29 *Vt.* 12 (*Sup. Ct.* 1856). The precedential worth in New Jersey of these decisions is very doubtful for the most part. The results are not uniform and are difficult of reconcilement. Some would appear to support the conclusion we have reached and others seem opposed. But there are obvious factual differences in many of the cases with respect to the kind of land, the source of the grant and the uses on which held. More important there appear in some instances to be diver-gences, as to the particular court's view of the basic public or non-public character attributed to the lands and uses, from the rationale of *Stockton* by which we feel bound.

One of the cases, however, merits brief mention because it rather sharply points up the fundamental difference be-tween public lands, as defined in *Stockton,* and those which would not be so characterized by our courts under the prin-ciples laid down there. We refer to *Inhabitants of Harrison v. Inhabitants of Bridgeton, supra* (16 *Mass.* 16), involving two towns originally under the jurisdiction of Massachusetts but located in the area which later became the State of Maine. In the original grant of Bridgeton, one sixty-fourth part of the land was laid out by the proprietors for the support of schools and a similar amount for the use of the ministry (similar to the 200 acres set aside for a like pur-pose by the Woodbridge charter). The ministry lands were sold, under legislative permission, and the proceeds invested, the income being used for the same purpose. Subsequently Harrison was incorporated, formed from a part of Bridgeton and a part of another existing town. The act of incorpora-tion provided that all property of the two original towns should be enjoyed by Harrison according to its "proportion of the taxes of the said towns." The two original municipal-

ities adjusted and paid to Harrison its share of all municipal property (including the school lands or proceeds thereof) except the proportion of the fund derived from the ministry lands. Harrison's suit to recover the same was decided in favor of Bridgeton on the ground that such property did not belong to Bridgeton as municipal property to be divided according to the statute, but only as a parish "to be appropriated only for parochial uses." The case was referred to in *Stockton* as indicating the difference between lands held by a town for public purposes as therein defined, such as school lands, and those held for more limited uses (and this despite the fact that in earliest colonial days there was no separation of church and state and, as in Woodbridge, the local church was supported by public moneys and managed by the town meeting).[8]

The judgment of the Chancery Division is affirmed. No costs to any party.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.

---

[8] In this connection, an episode concerning the Woodbridge ministry lands is of interest. In the late 1700's, a number of residents in the Metuchen area separated from the Woodbridge church and formed another congregation in that section. They sought a share of the rent from the lands and the refusal resulted in a law suit begun in 1795. Chancery denied the Metuchen church's claim and the judgment was affirmed in 1800 by the court of appeals (the governor and council) on an eight to five vote. *Dally, op. cit.*, p. 224–226; *Hunt, op cit., second section*, p. 7. The basis of the decision has not been learned, since the record of the case cannot be found in the state archives by reason of lack of knowledge of the precise names of the parties.