FAIRLEIGH S. DICKINSON, JR., RAYMOND BATEMAN, INDIVID-
UALLY AND AS GUARDIAN AD LITEM OF MICHAEL BATE-
MAN, WAYNE DUMONT, JEREMIAH O'CONNOR, J. HERBERT
LEVERETT, INDIVIDUALLY AND AS GUARDIAN AD LITEM
OF DWAYNE HERBERT LEVERETT, MARGARET KELLER,
CHARLES ROHDE, AND JOHN J. SULLIVAN, PLAINTIFFS-
APPELLANTS AND CROSS-RESPONDENTS, v. THE FUND
FOR THE SUPPORT OF FREE PUBLIC SCHOOLS, DONALD
LAN, SECRETARY OF STATE OF THE STATE OF NEW JER-
SEY, ACTING AS SECRETARY OF STATE AND AS SECRE-
TARY OF THE FUND FOR THE SUPPORT OF FREE PUBLIC
SCHOOLS AND DONALD LAN AS TRUSTEE OF THE FUND
FOR THE SUPPORT OF FREE PUBLIC SCHOOLS; AND THE
TIDELANDS RESOURCE COUNCIL, A DIVISION OF THE
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PRO-
TECTION, DEFENDANTS-RESPONDENTS AND CROSS-AP-
PELLANTS.

Argued September 12, 1983—Decided December 21, 1983.

66

68

*E. Carter Corriston* argued the cause for appellants and cross-respondents (*Breslin and Breslin,* attorneys; *Terry Paul Bottinelli,* on the brief).

*Deborah T. Poritz,* Deputy Attorney General, argued the cause for respondents and cross-appellants (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole,* Assistant Attorney General, of counsel; *William Harla,* Deputy Attorney General, on the brief).

*John R. Weigel* argued the cause for *amicus curiae* New Jersey Land Title Association (*John R. Weigel* and *Joseph M. Clayton, Jr.,* attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

This case concerns the meaning and constitutionality of the November 3, 1981 amendment to the New Jersey Constitution adopted on November 3, 1981, *N.J. Const.* of 1947, art. VIII, § 5, para. 1 (the "Amendment"), which created in effect a statute of limitations on State claims to New Jersey tidelands. The Amendment bars the State's claims to lands that have not been tidally flowed for a period of 40 years unless the State has "specifically defined and asserted" its claims within that period. As to lands not tidally flowed during the 40 years or more before adoption of the Amendment, the State has an additional year specifically to define and assert its claim.

The ten plaintiffs, all New Jersey residents, include landowners, taxpayers, a public school teacher, two public school students, an owner of a bond issued by a New Jersey school district, and a purchaser of a riparian grant from the State. The

defendants are the Tidelands Resource Council (the "Council"),[1] the Fund for the Support of Free Public Schools and the trustees of the Fund. The complaint charged: (1) that the Amendment was invalid because it purported to convey title to certain riparian lands to upland owners without consideration to the State, thereby violating the federal and state Constitutions; (2) that the Amendment deprived the trustees and beneficiaries of the Fund of property without due process and just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution; (3) that because the State will not be able to map all the riparian lands that it owns for almost five years, some upland owners will obtain riparian lands without consideration whereas others will have paid compensation for riparian lands abutting their property, thus constituting discrimination in violation of the Fourteenth Amendment to the United States Constitution and article I, paragraphs 1 and 5 of the New Jersey Constitution; (4) that the Tidelands Resource Council "arbitrarily, capriciously and unreasonably refused to approve" maps so that plaintiffs will lose their claims to unmapped riparian lands; and (5) that purchasers of school bonds issued since enactment of the New Jersey School Bond Reserve Act in 1980 relied on the security of proceeds from the sale of riparian lands pledged to the Fund for the Support of Free Public Schools and that the effect of the Amendment is to impair that security, thereby violating the contract clauses of the New Jersey and United States Constitutions. The defendants filed a general denial and ten affirmative defenses ranging from lack of subject matter jurisdiction to lack of standing.

The trial court denied defendants' motion for judgment on the pleadings. Upon completion of a plenary hearing, the trial court in a written opinion, 187 *N.J.Super.* 320 (Law Div.1982), concluded that it was unnecessary to decide the constitutional issues

---

[1]The Tidelands Resource Council is the successor to the Natural Resource Council, *L.*1979, *c.* 386, § 3, which succeeded, *L.*1971, *c.* 133, § 2, the Resource Development Council, *L.*1970, *c.* 33, § 4. *N.J.S.A.* 13:1D–3.

because 1632 base photomaps that had been prepared by the State satisfactorily delineated the State's claims. *Id.* at 335, 338–39. A map of the State depicting the locations reflected on these base photomaps was marked in evidence at the trial as Exhibit P–13 ("P–13"). The trial court ordered the defendants to file the photomaps and P–13 with the Secretary of State and with clerks of counties and municipalities in which the lands were situated. The trial court also ordered the defendants to complete mapping in accordance with *N.J.S.A.* 13:1B–13.4 by December 31, 1985. *Id.* at 340–41.

Both plaintiffs and defendants appealed. The New Jersey Land Title Association was permitted to intervene as *amicus curiae.* The Appellate Division, in a divided decision, reversed in an opinion written by Judge Greenberg and dismissed the complaint. 187 *N.J.Super.* 224 (1982). It rejected the plaintiffs' constitutional attack and upheld the validity of the Amendment. *Id.* at 249–53. However, the Appellate Division decided that the base photomaps did not satisfy the Amendment, *id.* at 242, but that only those base photomaps with a scribed overlay depicting a line where it was alleged the water had tidally flowed were sufficient (908 photomaps with overlays had been approved by the Council at the time of the Appellate Division opinion on October 22, 1982).[2] The Appellate Division also held that the State had the burden of establishing that land had been tidally flowed, *id.* at 245, and that for the purpose of the Amendment mapping had to meet the statutory requirements of *N.J.S.A.* 13:1B–13.1 to −13.6 ("Title 13"), *id.* at 241–43. The dissenting opinion accepted the majority's constitutional holding, *id.* at 254, but agreed with the trial court that the photomaps with or without a scribed overlay were sufficient to assert the State's claims, *id.* at 263–64.

---

[2] Though the Appellate Division opinion expressed the thought that there had to be compliance with *N.J.S.A.* 13.1B–13.1 to −13.6, the opinion also indicated that base photomaps with specific delineation of the State's claims were sufficient. 187 *N.J.Super.* at 241, 243.

Plaintiffs filed a notice of appeal and petition for certification. The defendants filed a cross-petition for certification.[3] Both petitions were granted. 93 *N.J.* 294 (1983). While these matters were pending the parties entered into a Consent Order dated October 26, 1982, providing that the defendants file the photomaps in accordance with the trial court's decision to preserve the integrity of that decision in the event this Court adopted the trial court's interpretation of the Amendment.

I

The Subject Matter of the Amendment

The historical background concerning the legal status of tidelands is described in detail in the Appellate Division opinion, 187 *N.J.Super.* at 227–32, and need not be repeated here. The crucial underlying historical fact is that the State owned all land below the mean high water mark on tidally flowed property. *O'Neill v. State Hwy. Dep't,* 50 *N.J.* 307, 323 (1967). Upland is land "above mean high water." *City of Newark v. Natural Resource Comn.,* 133 *N.J.Super.* 245, 252 (Law Div.1974), aff'd, 148 *N.J.Super.* 297 (App.Div.1977). Interior land that the mean high tide did not reach was not tideland. 50 *N.J.* at 324. The State could not acquire interior land artificially, such as by constructing ditches that divert the tide onto lands otherwise unflowed. Nor could the riparian owner, generally speaking,[4] enlarge his holdings by excluding the tide. *Ibid.* It was the need to unravel the artificial changes and to determine the legal

---

[3]The cross-petition raised two issues. The Attorney General objected to the holdings that all mapping had to conform with Title 13 and that the State had the burden of proving that land, now upland, had at one time been tidally flowed. The Deputy Attorney General during oral argument withdrew the objection to the burden of proof issue. The State is thereby acknowledging that it has the burden of proof in non-meadowlands as well as meadowlands properties.

[4]There are exceptions, such as construction based on local custom, which was sanctioned by the Wharf Act. *L.*1851, *p.* 335.

status of the land that motivated this Court to suggest in *O'Neill* "that the appropriate officers of the State should do what is feasible to catalogue the State's far flung holdings." 50 *N.J.* at 320. *O'Neill* pertained to land in the Hackensack meadowlands and attention focused on cataloguing the State's ownership claims in the meadowlands. The legislative response to *O'Neill* was enactment of *N.J.S.A.* 13:1B–13.1 to –13.6.

Title 13 required that the Council undertake title studies and surveys of "meadowlands" throughout the State "to determine and certify those lands which it finds are State owned lands." *N.J.S.A.* 13:1B–13.2. "Meadowlands" are defined as "those lands, now or formerly consisting chiefly of salt water swamps, meadows or marshes." *N.J.S.A.* 13:1B–13.1(a). The statute also states that "[i]mproved meadowlands" means those "reclaimed by fill or other material" and may include structures. *N.J.S.A.* 13:1B–13.1(b). "Virgin meadowlands" are defined to be those in their "natural state." *N.J.S.A.* 13:1B–13.1(c). Nowhere in the operative sections of the statute is any reference made to "improved" or "virgin" meadowlands.

The Council is directed to publish a map "clearly indicating those lands designated ... as State-owned lands." *N.J.S.A.* 13:1B–13.4. Copies are to be filed with the Secretary of State and the clerks of the counties and municipalities wherein the land lies. *Ibid.* A list of the parcels is to be published in a newspaper circulating in the relevant county. *Ibid.* Aggrieved parties can lodge objections and file pertinent information with the Council, which in turn would review its prior determination. Aggrieved parties have the right to institute suits to quiet title. *N.J.S.A.* 13:1B–13.5. The Council also has the authority to sell or lease the State's interest in the meadowlands, *N.J.S.A.* 13:1B–13.7, the net proceeds to be paid into the Fund for the Support of Free Public Schools, *N.J.S.A.* 13:1B–13.13.

The mapping statute originally provided that the studies and title surveys be completed on or before December 31, 1974. *L.*1968, *c.* 404, § 92. This was extended to December 31, 1977,

*L.*1975, *c.* 288, § 1, and to December 31, 1980, *L.*1978, *c.* 44, § 1. Part of the delay was due to the litigation involving the mapping techniques used by the State. *See City of Newark v. Natural Resource Coun.,* 133 *N.J.Super.* 245 (Law Div.1974), aff'd, 148 *N.J.Super.* 297 (App.Div.), certif. granted and matter summarily remanded for clarification of opinion, 75 *N.J.* 32, clarified and aff'd, 152 *N.J.Super.* 458 (App.Div.1977), aff'd, 82 *N.J.* 530, *cert.* den., 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980) (for a description of this litigation). The unambiguous statutory language limits the scope of cataloguing to "meadowlands throughout the State." *N.J.S.A.* 13:1B–13.2. It may be observed that the statute required that the first survey be made of the Hackensack meadowlands. *Ibid.* We agree with the dissenting opinion of the Appellate Division that the statute was intended to apply "only to meadowlands and not to other tidelands." 187 *N.J.Super.* at 258; *see id.* 258–59 (describing the history of *N.J.S.A.* 13:1B–13.1 to –13.6).[5] The mapping statute covered all meadowlands throughout the State, whether or not they had been affected by artificial conditions, and did not extend to non-meadowlands tideland properties.

Although Title 13 required that the State examine only the meadowlands, the State decided to investigate all tidal properties in which it might have an interest. N.J. Department of Environmental Protection, Administrative Order No. 34 (July 26, 1973). *O'Neill* alerted the State and property owners of lands abutting the ocean, rivers and bays of the possibility of the State's interest in these properties. The uncertainties of the legal status of upland properties were manifest. If the upland condition had been artifically created by an impermissible method, ownership of the land might be in the State. *Borough of*

---

[5] Then First Assistant Attorney General Judith Yaskin in her testimony at the Public Hearing before the Subcommittee of the Assembly Agriculture and Environment Committee on the proposed constitutional Amendment pointed out that Title 13 applied only to the meadowlands. *Public Hearing before Subcommittee of the Assembly Agriculture and Environment Committee on ACR–3037 and SCR–3023* 4 (July 23, 1981).

*Wildwood Crest v. Masciarella,* 51 *N.J.* 352, 357 (1968); *Garrett v. State,* 118 *N.J.Super.* 594, 600 (Ch.Div.1972).

The constitutional Amendment was addressed to these concerns.[6] The Amendment was an attempt to ameliorate these anxieties and expedite resolution of title disputes. At the joint hearing of the Senate and General Assembly committees held pursuant to article IX, paragraph 1 of the Constitution to consider whether the Amendment should be submitted to the people, Senator Perskie, who presided and was a sponsor of the resolution, stated that the proposed Amendment

would provide, in effect, a statute of limitations within which the State would have a right to define and to assert the riparian rights. . . . . [T]his proposed amendment is not designed and would not have the effect of depriving the State of any riparian claim to that which the Constitution entitles the State. It simply provides a time frame within which any such claim may be defined and asserted after a given piece of ground would cease to be tidal flowed. [*Public Hearings before Senate Judiciary Committee and Assembly Judiciary, Law, Public Safety and Defense Committee on ACR–3037 and SCR–3023* 1 (June 5, 1981)]

The Administration opposed the adoption of the resolution authorizing submission of the Amendment to the electorate. Richard McManus, Associate Counsel to the Governor, stated at the public hearing that "[t]he period provided in the amendments is much too brief a period for the State to complete its work." *Id.* at 2. Judith Yaskin, First Assistant Attorney General, asserted there that though mapping of the entire state had been proceeding for the past ten years, a year and a half would not be sufficient time to complete the mapping. *Id.* at 5. She claimed the Legislature had not provided sufficient money or manpower. *Id.* at 17. Despite the opposition, three fifths of all members of the Senate and Assembly agreed to submit the

---

[6] At the joint public hearing the "cloud that hangs over the title to tens of thousands of acres" and to "the ownership of thousands of homes, commercial businesses and industrial operations" was emphasized. *Public Hearings before Senate Judiciary Committee and Assembly Judiciary, Law, Public Safety and Defense Committee on ACR–3037 and SCR–3023* 27 (June 5, 1981) (testimony of Robert Ferguson, Executive Vice President, N.J. Association of Realtors).

Amendment to the people. The Amendment, adopted in the general election of November 3, 1981, reads as follows:

> No lands that were formerly tidal flowed, but which have not been tidal flowed at any time for a period of 40 years, shall be deemed riparian lands, or lands subject to a riparian claim, and the passage of that period shall be a good and sufficient bar to any such claim, unless during that period the State has specifically defined and asserted such a claim pursuant to law. This section shall apply to lands which have not been tidal flowed at any time during the 40 years immediately preceding adoption of this amendment with respect to any claim not specifically defined and asserted by the State within 1 year of the adoption of this amendment. [*N.J. Const.* of 1947, art. VIII, § 5, para. 1]

It is undisputed that the lands referred to in the Amendment include meadowlands and non-meadowlands. It is also clear that the Amendment applies only to lands that had been tidally flowed at one time. However, the effect of the Amendment may not be the same on all tidally flowed land. Thus, the State may have no claim to upland that became tidally flowed because of avulsion [7] or some artifically created condition. *O'Neill v. State Hwy. Dep't,* 50 *N.J.* 307, 324 (1967).

It is also apparent that the Amendment relates only to properties that are not now tidally flowed, but had at one time been naturally tidally flowed. After such properties have not been so flowed for a 40-year period, the State's claim will be time-barred unless the State has "specifically defined and asserted such a claim pursuant to law" prior to the expiration of the 40-year period. The Amendment afforded the State an additional year specifically to define and assert claims when the 40-year period would have elapsed by November 3, 1981. Thus the State had one year, to November 3, 1982, to claim lands that had not been flowed by the tides since at least November 1941. Land that had become upland by natural accretion or reliction [8]

---

[7] Avulsion is the sudden and perceptible addition or erosion of land, such as caused by a storm. *Garrett v. State, supra,* 118 *N.J.Super.* at 601.

[8] Reliction is "the gradual [and imperceptible] withdrawal of the water from the land by the lowering of its surface level." *Id.* at 600 (quoting *Ziemba v. Zeller,* 165 *Neb.* 419, 421–22, 86 *N.W.*2d 190, 193 (Sup.Ct.1957)).

generally belonged to the abutting property owner irrespective of the duration of time during which it had been upland. *Borough of Wildwood Crest v. Masciarella*, 51 *N.J.* 352, 359 (1968). With respect to accretion or reliction that occurs in connection with artificial structures, see the discussion in *Borough of Wildwood Crest, supra*, 51 *N.J.* at 359–61.

## II

### How the State May Define and Assert a Claim Under the Amendment

■ We are initially concerned with whether the State must satisfy the requirements of *N.J.S.A.* 13:1B–13.1 to –13.6 in order to "specifically define and assert its claim pursuant to law." Plaintiffs argue that "pursuant to law" refers to statutory law and that the only legislative pronouncement dealing with identification of State claimed riparian property is found in Title 13. Accordingly, the State must comply with Title 13. This contention is flawed for several reasons.

First, Title 13 delineated a methodology that was to be used to enable the Council "to *determine* and *certify* those lands which it *finds* are State owned lands." *N.J.S.A.* 13:1B–13.2 (emphasis added). This standard differs from one in which the State proposes to assert a claim. The difference is not simply semantic. Determination and certification that lands are owned by the State call for more stringent requisites than simply asserting a claim. Second, as previously observed, Title 13 does not encompass all riparian lands; and studies of meadowlands properties may involve factors substantially different from those involved in oceanfront properties. Third, it is obvious that claims could be defined and asserted in ways different from that prescribed in Title 13. It is reasonable to assume that the people's intent was not that restrictive. A listing of the statutory requirements makes the point self-evident. Title 13 requires the preparation of a survey and publishing of a map, which must be filed with the Secretary of State and sent to the clerk of each

county and municipality where the land is situated. *N.J.S.A.* 13:1B–13.4. There must be publication of a list of the parcels designated in whole or in part as State-owned lands in a newspaper circulating in the county where the land is located. *Ibid.* Title 13 has been interpreted to compel the State to set forth on the maps any riparian grants that it may have made. *City of Newark v. Natural Resource Coun., supra,* 133 *N.J.Super.* at 261. That is consonant with the legislative (Title 13) imperative that the State *certify* ownership, a requirement that need not be satisfied under the Amendment. Descriptions of the land, whether in the form of a map or otherwise, notice to the landowners, the amount and nature of evidence necessary to make a claim under the Amendment—all could justifiably differ from Title 13, particularly since the purposes of Title 13 and the Amendment are not identical. Restricting the Council to Title 13 procedures would be an unnecessary impairment of its administrative flexibility. That the Council generally employed the Title 13 procedures in non-meadowlands areas, a program initiated in 1973, long before the Legislature considered the proposed Amendment, does not vitiate the Council's authority to utilize another methodology.[9]

We find nothing in the legislative history of the Amendment that supports the conclusion that Title 13 sets forth the exclusive manner in which a claim could be made. This is not to say that the Legislature could not enact a statute prescribing the method to define and assert a claim. We find, however, that even in the absence of such a statute, the Council has authority to designate and describe lands that the State claims it owns. The Legislature has authorized the Council to convey and lease property. *E.g., N.J.S.A.* 12:3–7, 12:3–10, 12:3–12, 13:1B–13, 13:1B–13.7. Implicit in that authority is the right

---

[9] *Quaere* the continuing vitality of *N.J.S.A.* 13:1B–13.2 directing title surveys and studies and of *N.J.S.A.* 13:1B–13.4 governing the publication and filing of maps and studies, since the studies and title surveys had to be completed by December 31, 1980. *N.J.S.A.* 13:1B–13.6.

to survey, map, and determine the boundaries of its lands. Indeed, the Council had started to investigate the status of beachfront properties that might be subject to the State's claims before adoption of the Amendment. *Public Hearing before Subcommittee of the Assembly Agriculture and Environment Committee on ACR–3037 and SCR–3023* 4 (July 23, 1981) (testimony of Judith A. Yaskin, First Assistant Attorney General).

The State must not only delineate the former tideland, but also should alert those having an adverse interest. That warning is necessary to fulfill a major purpose of the Amendment, namely, to relieve property owners from State ownership claims that may or may not be valid. Sometimes it is difficult to determine whether land ever had been flowed by the tide, and unless the State acted affirmatively, owners would be uncertain indefinitely as to whether the State "has a claim to the land." *Gormley v. Lan,* 88 *N.J.* 26, 35 n. 2 (1981).[10] A claim made in good faith by the State notifying the property owner is all that is required.

---

[10]The following explanatory statement appeared on the ballot when the Amendment was voted upon:

> The primary purpose of this amendment is to relieve owners of land from certain competing claims of ownership by the State. These claims arise from the fact that the State may own any land that ever had the ordinary high tide ("mean" high tide) flow over it, regardless of who the record owner may be or how long he has occupied the land. Sometimes it is difficult to determine that fact and owners may be uncertain for years if the State has a claim to the land.
>
> When the State establishes ownership of tidal flowed land, any proceeds from the sale of the land are deposited in a fund devoted to public education.
>
> This amendment provides that if the State does not, within one year, present all claims on lands that have been "dry" for at least 40 years, those claims are barred. The State may have claims for such land that would succeed under present law but that may be extinguished by virtue of this amendment, if for any reason the State does not assert such claims within that one year. [Reprinted in *Gormley v. Lan,* 88 *N.J.* 26, 35 n. 2 (1981).]

Much of the controversy centers on a map introduced into evidence as Exhibit P–13. The plaintiffs and our dissenting colleague contend this exhibit conforms with the Amendment's requisite of *specifically* defining the land. We hold otherwise. P–13 is a map of the State. Charted on the map are a series of 1632 squares, each representing about 1.5 miles square. They aggregate 2445 square miles or approximately 30% of the land mass of New Jersey. Each square corresponds with an aerial photograph, a photomap, in the Office of Environmental Analysis in the New Jersey Department of Environmental Protection. The squares extend along the Atlantic Coastline to Cape May and thence up the Delaware Bay and River to Trenton. P–13 also groups the squares into zones, the land within a zone having similar tidal characteristics.

Some of the squares on P–13 are colored. As to the land within those colored squares, the State had made a sufficient investigation and study to enable it to prepare a claim overlay showing the mean high water mark and thereby delineating the lands it claimed within those areas. By the November 2, 1982 deadline, 917 aerial photomaps with such claim overlays had been finalized and filed. These cover 1377.79 square miles. In addition a Claims Overlay Preparation Summary listing all sources investigated for a particular map was prepared.

The uncolored squares on P–13, representing lands primarily in the Delaware Tidal region, show areas for which the State had not prepared claim overlays by November 2, 1982, but for which it had only the aerial photographs. Photomaps of those uncolored squares may or may not contain any tideland claims. At best they are indicia that the State is investigating these lands.

The photomaps of these uncharted squares had been prepared by the Office of Environmental Analysis in 1977 and 1978, well before the Legislature had proposed submission of the Amend-

ment to the electorate.[11]  An index to the maps published by the Council in 1979, entitled *Index, Lands Subject to Investigation for Areas Now or Formerly Below Mean High Water* (the "*Index*"), showed the areas that had been photographed in squares, each representing about 1½ square miles.  These are the same squares portrayed on P–13, except that those in the *Index* show the municipalities, major roadways, land, ocean and water ways. The *Index* depicted all lands that were to be subjected to systematic and comprehensive analysis for potential areas now or formerly below mean high water.[12]  It is incongruous indeed to suggest that in 1981 the Legislature proposed a constitutional amendment requiring the distribution of photomaps that had been available to the public since June 1979.

The Attorney General agrees that the uncharted squares do not constitute a claim satisfying the constitutional mandate. David Moore, chairman of the Tidelands Resource Council, testified at the trial that he could not in good faith assert a claim on behalf of the State to these properties.  When asked why, he responded:

> I think there are a number of reasons, not the least of which is that the Council feels a responsibility not to claim land that it has knowledge that the State has no interest in.  We know as a result of the mapping process that's gone on that there are likely to be significant areas of land to which the State has no claim involved in the P–13 exhibit along the Delaware.

Mr. Moore also explained the significance of the uncharted squares:

> Q. All that is is a, that really only shows areas of investigation, doesn't it?
> A. It is a key sheet.
> Q. That's all it is?
> A. Yes.

---

[11]Copies were available for the public.

[12]P–13 contains five squares more than does the 1979 edition of the *Index,* three of these squares having been added as published errata to the *Index* in March 1980, one in 1982 and one in 1983.  Four of the squares are in the Newark-Elizabeth and Hackensack areas, and one near Cape May.

Q. It's an area that was determined to be investigated so that you could subsequently learn if in fact a claim can be made?

A. That is so.

Q. You wouldn't be asserting a claim by that map, you'd be just contemplating a further investigation so maybe you could assert a claim?

A. That is so.

We agree with Judge Greenberg's comments in his Appellate Division opinion that

it can hardly be conceived that the Legislature in proposing the amendment or the people in adopting it could have intended the State to act in bad faith. Yet it is clear that if P–13 and the photo base maps are filed without specific delineation of the State's claim on a property-by-property basis, the claim will not be made in good faith. It is of no assistance to a property owner to know that the claim against him is contingent only. He wants to know the actual status of his property. [187 *N.J.Super.* at 242–43]

The uncharted areas indicate at most areas suspected of possibly containing some tidelands. It must be kept in mind that we are not concerned with the land that is presently subject to the ebb and flow of the tides or had been within the forty-year period prior to November 1981. The Amendment implicates only those lands once flowed at mean high tide that are no longer so flowed, more of which is in the Atlantic Coastal area than in the Delaware Tidal region. Thirty-seven percent of the photomaps of the Atlantic Coast contained no formerly-flowed tidelands. Furthermore, if the State's experience on its claims in the Atlantic Coastal areas proves true in the Delaware Tidal region, then no more than 15% of the lands subject to investigation in the Delaware Tidal region would be subject to a claim by the State.

Deeming the base photomaps alone specifically to define claims would usurp the fundamental right exercised by the people to revise their Constitution. The public in granting the State an additional year to define lands it claimed as tidelands must have intended the State to do more than it had already done. Moreover, as previously observed, the Administration had opposed the Amendment precisely because it believed that the additional work necessary could not be completed within one year.

On the other hand, we believe that where the State's mapping reached the point that it designated the place where the tide had flowed, as shown on its claim overlays, the Amendment's specific delineation requirement has been met. We respect this administrative judgment of the Council. *See City of Newark v. Natural Resource Coun., supra,* 82 *N.J.* at 539–40. Unquestionably the Council has acted in good faith by making claims for which it has a reasonable basis.

■ The Amendment was addressed to the issue of what constituted tidelands and the uncertainty related to the resolution of that issue. It is true, of course, that the State at various times had granted riparian rights. However, it was not necessary for the State to set forth the grants that it had made. These are known by the grantees and presumably by their successors in interest. We do not find that the State was under a duty to make and impose grant overlays to be superimposed upon the base photomaps to meet the Amendment's standards.

■ We are satisfied that the State has "asserted" as well as "specifically defined" its riparian claims. The public has been given notice of the State's claims. The claimed areas are shown on P–13 and the base photomaps with the claim overlays. All have been filed with the Secretary of State and county and municipal clerks.

The plaintiffs argue that in adopting the Amendment the people never intended to surrender possible claims by the State and a possible consequential loss of funds from the possible sale or lease of those lands (after successfully establishing ownership), which would have been devoted to the public school Fund. The record belies this contention. The voters were asked to make a choice between two sharply opposing points of view. Opponents claimed the Amendment constituted a "giveaway" because the mapping could not be completed within one year and the Fund would suffer a monetary loss. Proponents argued that the Amendment would terminate within a reasonable period the uncertainty that record landowners had with respect to

whether their property was being claimed by the State. The choice was made by the people. That choice is not to be frustrated, but rather the people's will and wisdom is to be respected by the Court.

### III

### The Constitutional Issues

We agree with the Appellate Division that the Amendment is not violative of the state or federal Constitutions essentially for the reasons stated in its opinion. 187 *N.J.Super.* at 249–53.

The plaintiffs' State constitutional arguments are founded on article VIII, section IV, paragraph 2 of the New Jersey Constitution and *N.J.S.A.* 18A:56–5. The constitutional provision states that the "fund for the support of free public schools, and all money, stock and other property, which may hereafter be appropriated for that purpose or received into the treasury under the provisions of any law" to augment the fund shall remain a permanent fund; that the income, except that to be added to the capital, shall be appropriated for the support of free public schools; and that the fund, including its income, may be applied as the Legislature may provide to secure the payment of principal or interest on bonds or notes issued for school purposes. *N.J. Const.* of 1947, art. VIII, § 4, para. 2. The statutory provision states that all moneys received from the sales of all lands belonging to the State now or formerly lying under water shall be paid to the Fund. *N.J.S.A.* 18A:56–5. The Legislature thereafter enacted the New Jersey School Bond Reserve Act, effective July 16, 1980. *N.J.S.A.* 18A:56–17 to –20 (the "Bond Reserve Act"). That act established in the fund for the support of free public schools (the "Fund") a reserve in an amount equal to at least 1½% of the aggregate issued and outstanding bonded indebtedness issued for school purposes by governmental bodies, but not to exceed the moneys available in the Fund. *N.J.S.A.* 18A:56–19.

The plaintiffs contend that under the New Jersey Constitution this legislative and constitutional vesting is unimpeachable and that the State's interest in riparian lands cannot be cut off. The short answer to this contention is that the people have a right to amend their Constitution. *N.J. Const.* of 1947, art. IX, § 1. The prior constitutional dedication did not preclude the people's right to withdraw or change that dedication by a constitutional amendment. *See Carpenter v. Cornish,* 83 *N.J.L.* 696, 697–99 (E. & A.1912) (implicitly holding the 1844 Constitution replaced the 1776 Constitution, even if someone were deprived of "some previously existing right" under the 1776 Constitution); *Morris v. Wrightson,* 56 *N.J.L.* 126, 193–96 (Sup.Ct.1893) (implicitly holding that the 1844 Constitution's provisions on apportionment of the Legislature replaced those in the 1776 Constitution); *cf. U.S. Const.,* amend. XXI (repealing 18th Amendment (Prohibition)). Indeed, as Judge Greenberg observed, the Amendment took nothing away from the State, for the State's ownership was no less the day after the adoption of the Amendment than it was the day before. 187 *N.J.Super.* at 244.

The federal constitutional arguments stand on a different footing. The plaintiffs contend that the Equal Protection Clause of the Fourteenth Amendment is violated since some property owners had acquired land that was once tidally flowed by purchase from the State and others will have acquired similar property without consideration because of the State's inability to define and assert its claim within the one-year time constraint. We perceive no merit in this contention. Judicial review calls for us to decide whether a conceivable legitimate basis exists for the classification and whether that classification is rationally related to that objective.[13] *State v. Senno,* 79 *N.J.*

---

[13]Neither a suspect classification nor a fundamental right is implicated. Therefore, the validity of the Amendment need not be justified on the ground that the means chosen are "necessary to promote a *compelling*" state interest. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 *U.S.* 1, 31, 93 *S.Ct.* 1278,

216, 227 (1979). The goals of eliminating uncertainties of title, of identifying properties and alerting owners of state claims, and of advancing economic development are legitimate ends justifying the repose after 40 years' existence of a condition indicating the absence of a State interest. It is not our function to second guess the people's judgment that these purposes foster the general welfare. Furthermore, the State has applied its resources in a sensible manner and has rationally selected the areas to be mapped. *Id.* at 228–29.

The plaintiffs argue that the Amendment deprives the Fund of its interest in some tidelands without adequate compensation in violation of the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. The plaintiffs reason that the Fund is a trust to which the State by statute has irrevocably transferred its interest in the tidelands and that the Amendment divests the Fund of those tidelands without compensation. Plaintiffs analogize this situation to that of a private trust. But the Fund is a creature of the New Jersey Constitution, subject to the will of the people to modify its terms, including elimination of the Fund's existence. *Cf. Becker v. Adams,* 37 *N.J.* 337, 340 (1962) (the Legislature's control over municipalities is "almost unlimited"); *Graham v. Edison Tp.,* 35 *N.J.* 537, 551–54 (1961) (lands held by a public educational trust, with a public grantor, are "to be treated no differently . . . from municipal property acquired for public use by any other means"); *Newark v. Stockton,* 44 *N.J.Eq.* 179 (E. & A.1888) (where a municipality is a trustee of public lands that have been settled by the public and not by an individual, the

---

1296, 36 *L.Ed.*2d 16, 42, reh'g denied, 411 *U.S.* 959, 93 *S.Ct.* 1919, 36 *L.Ed.*2d 418 (1973) (quoting *Shapiro v. Thompson,* 394 *U.S.* 618, 634, 89 *S.Ct.* 1322, 1331, 22 *L.Ed.*2d 600, 615 (1969)). Further the character of the classification and the importance of the rights affected do not warrant application of intermediate scrutiny, that the classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 *U.S.* 190, 197, 97 *S.Ct.* 451, 457, 50 *L.Ed.*2d 397, 407 (1976).

Legislature has the power to change the purposes of the trust). We find no merit in plaintiffs' position.

The plaintiffs also contend that the Amendment violates the Contract Clause of the federal Constitution, which provides that no state shall pass any "Law impairing the Obligation of Contracts." *U.S. Const.,* art. I, § 10, cl. 1. The rationale relied upon is that school bonds issued after July 16, 1980, the effective date of the New Jersey School Bond Reserve Act, are entitled to the benefit of a reserve in the Fund in an amount equal to at least 1½% of the aggregate principal amount of the bonds issued and outstanding and that any impairment of the State's ability to sell or lease riparian lands would adversely affect the security of the bonds.

It is important to recognize that this contract claim relates only to bonds issued between July 16, 1980, the effective date of the Bond Reserve Act, and November 2, 1981, the effective date of the Amendment. Buyers of bonds issued before the Bond Reserve Act have no contractual rights to the reserve. Buyers of bonds after the Amendment became effective would be aware of the possible loss to the Fund of some proceeds from the sale of State tidelands. Their contracts would impliedly contain this reservation and accordingly they could not contend that any provision in the terms of the bonds had been violated. As of June 30, 1981 there were $1,144,802,781 principal amount of bonds issued in this period, which are entitled to a reserve of $17,172,042. Of 34 school districts whose bond ratings were upgraded by Standard and Poor's after the Bond Reserve Act was passed, 11 issued bonds by May 1982 whose maturity date was after 1995. The amount in the school Fund as of June 30, 1981 was $38,420,320.[14]

The bonds in question carried the following legend:

---

[14]The Fund was created in 1817. *L.*1817, *p.* 26. Until 1871 proceeds from riparian land were not earmarked for the Fund. *L.*1871, *c.* 530. From 1976 to

"Payment of this obligation is secured under the provisions of the 'New Jersey School Bond Reserve Act' in accordance with which an amount equal to 1½% of the aggregate outstanding bonded indebtedness (but not to exceed the moneys available in the fund), of New Jersey counties, municipalities and school districts for school purposes as of September 15 of each year, is held within the State Fund for the Support of Free Public Schools as a school bond reserve pledged by law to secure payments of principal and interest due on such bonds in the event of the inability of the issuer to make payment." [*N.J.S.A.* 18A:56–20]

The Amendment does not violate any financial condition of the bonds. The 1½% reserve is there and will remain until the bonds are satisfied. Plaintiffs argue that the reserve will be effectively diminished because of the deflation of the dollar's value with the passage of time. Erosion of the reserve in terms of inflation does not affect the percentage relationship of the dollar amount of the reserves to the principal amount of the bonds issued during the 15½ month period. Moreover, the Fund may be increased from sources other than the receipts from riparian lands. Thus, investment income from the Fund may be used to increase its capital. *N.J. Const.* of 1947, art. VIII, § 4, para. 2. Further, the Legislature may appropriate moneys to the Fund and we have no reason to believe that if additional security were needed the trustees of the Fund would not use income from the Fund to increase the principal or that the Legislature would not appropriate the necessary moneys for that purpose.

At best, the Amendment's financial impact on the bonds is speculative. What moneys, if any, will be received from riparian lands depends on the discretion exercised by the Tidelands Resource Council, the Commissioner of Environmental Protection and the Governor. *N.J.S.A.* 13:1B–13. These public officials might refuse to dispose of tideland property because of an adverse environmental effect or because the riparian land could be put to use for a public purpose, such as a park, or because the consideration offered was insufficient. We have previously

1981 the average annual amount received by the Fund from the sale and lease of riparian lands was approximately $2,000,000.

adverted to the small amount of land involved (being limited to the Delaware Tidal region and not having been tidally flowed for 40 years since at least November 1941). The financial effect is insignificant at best. We note that the adoption of the Amendment had no effect on the bond ratings and the plaintiffs produced no evidence that the market price of the bonds suffered because the Amendment was adopted. We are satisfied, for the reasons stated by Judge Greenberg, 187 *N.J.Super.* at 250–53, as supplemented herein, that the Contract Clause has not been violated. *See Fidelity Union Trust Co. v. N.J. Highway Auth.*, 85 *N.J.* 277, 289, appeal dismissed for want of a substantial federal question, 454 *U.S.* 804, 102 *S.Ct.* 76, 70 *L.Ed.* 2d 73 (1981).

## IV

### Conclusion

We hold that the base photomaps supplemented by the claim overlays constitute a sufficient delineation of the State's claims to satisfy the constitutional Amendment and that the base photomaps without such overlays are not sufficient. We also hold that the filing of the maps and overlays with the Secretary of State and county and municipal authorities are notice to the public and the property owners of the land depicted in the maps. Lastly, we hold that the Amendment is valid under the New Jersey and federal Constitutions.

The judgment is reversed in part and affirmed in part.

HANDLER, J., dissenting in part.

In this case the Court grapples with yet another series of important and controversial issues concerning the State's tidelands. This latest round of litigation has been generated by the amendment to the New Jersey Constitution, adopted on November 3, 1981. *N.J. Const.* (1947), Art. VIII, § V, par. 1. That amendment initiates a definitive solution to the chronic ownership problems that have beset the extensive tidelands located

within our State. These have been painstakingly described on
several occasions. *O'Neill v. State Hwy. Dept.*, 50 *N.J.* 307
(1967); *City of Newark v. Natural Resources Coun. Dept. Env.
Prot.*, 82 *N.J.* 530 (1980), *cert.* den., 449 *U.S.* 983, 101 *S.Ct.* 400,
66 *L.Ed.*2d 245 (1980). I agree with the Court's resolution of all
the issues litigated in this case except one. I differ from the
Court with respect to the limitations it has placed judicially
upon the manner in which the State under the amendment can
claim, and ultimately resolve, the ownership of those tidelands
which the amendment encompasses.

The Court now decides that the State was not authorized
under the constitutional amendment to claim as tidal flowed
those properties that were depicted on an existing map which
had been developed in conjunction with the State's ongoing
investigation of its tide flowed lands. The flat rejection of this
map (referred to as P–13) as evidencing the State's riparian
claims is tantamount to a forfeiture of State lands. Further, it
deprives the public of the proceeds from the State's disposition
of such lands, proceeds otherwise applied to public education
through the constitutional and statutory fund created for that
purpose. *N.J. Const.* (1947), Art. VIII, § IV, par. 2; *N.J.S.A.*
18A:56–5. The abrupt and substantial loss of public assets now
dictated by the Court is neither mandated by the language of
the constitutional amendment nor evidenced from the history
and circumstances surrounding its passage. I therefore dissent
from the Court's decision in this respect. My reasons essentially
parallel those in the dissenting opinion of Judge Michels in the
Appellate Division, 187 *N.J.Super.* 224, 254 (1982), as well as the
similar reasoning expressed in the opinion of Judge Simpson in
the trial of this matter in the Superior Court, Law Division, 187
*N.J.Super.* 320 (1982).

It is beyond argument that the language of the constitutional
amendment does not expressly or plainly prohibit the State from
utilizing its existing tidelands map as a basis for its riparian
claims. The constitutional amendment requires only that the
State take prompt affirmative action with respect to its tide-

lands. The State must within one year of the adoption of the amendment specifically define and assert ownership claims to such lands.

The amendment provides essentially that if lands have not been "tidal flowed" for at least 40 years, the State shall be barred from asserting a claim to such lands as "riparian lands." This bar, however, can be lifted under two conditions. The first condition is if the State has previously—within the last 40 years—"specifically defined and asserted" a riparian claim to such lands, it can continue, presumably, to maintain such a claim. The second condition that would overcome the bar is if a claim is made by the State to such lands within one year following the adoption of the constitutional amendment. *N.J. Const.* (1947), Art. VIII, § V, par. 1.

Riparian claims under the amendment must be made "pursuant to law." The Appellate Division majority concluded that the "law" subsumed by this phraseology meant the meticulous mapping, notice and filing procedures specified for meadowlands under *L.*1968, *c.* 404; *N.J.S.A.* 13:1B–13.1 *et seq. Dickinson v. Fund for Support of Free Pub. Schools,* 187 *N.J.Super.* 224, 241 (App.Div.1982). Under this view of the constitutional amendment, the only claims to tidelands effective in lifting the bar would be those incorporated in the detailed maps made, filed and publicized pursuant to that statute.

On this point the Court correctly rejects the conclusion of the Appellate Division majority. The Court in effect endorses the dissenting views of Judge Michels. *Ante* at 75. I concur. Judge Michels explained that the detailed statutory mapping scheme of *N.J.S.A.* 13:1B–13.1 *et seq.* was clearly referable to the "meadowlands," which constitutes a distinctive category or subset of the State's tidelands. 187 *N.J.Super.* at 258–60. The Court in adopting the basic reasoning of Judge Michels recognizes that the Legislature in proposing the constitutional amendment did not designate the meadowlands mapping act as the

exclusive legal vehicle by which the State would be required to make claims to the 40-year tide-fast properties.[1]

The critical inquiry therefore is to ascertain the proper meaning to be ascribed to the added constitutional language of the amendment that a State riparian claim be "specifically defined and asserted." The majority concludes that it would be somehow "incongruous" for the Legislature to have proposed in 1981 a constitutional amendment that *required,* as the State's riparian claims, the distribution of a photomap that had been available to the public since June 1979, *ante* at 81 (emphasis added). The Court apparently considered the proposition to be anomalous because the people "must have intended the State to do more than it had already done." *Ante* at 83. This perceived incongruity leads the Court to reject any use of the existing tidelands map, P–13, as the basis for the State's riparian claims under the amendment.

I strongly disagree with the premise that is implicit in the Court's reasoning. The question to be dealt with is not whether the Legislature *required* the distribution of the existing tidelands map, P–13, as the method by which the State could present its riparian claims under the amendment. Rather the question is whether the Legislature *permitted* P–13 to be used by the State to satisfy its responsibility under the amendment. I find nothing persuasive in the background and circumstances surrounding the passage of the amendment that militates

---

[1]The Court points out that the differences in the State's duties under the meadowlands mapping act and those that arise under the amendment are "not simply semantic." *Ante* at 78. The meadowlands mapping act is designed to have the State do more than merely "claim" lands. It requires the State to "find" that certain lands are "State owned" and to "determine and certify" that ownership. *N.J.S.A.* 13:1B–13.2. In addition to the legislative treatment of meadowlands as distinct from other kinds of tidelands, as the Court points out, the meadowlands mapping act contains a plethora of detail, including the publication and filing, the listing of parcels, and the depiction of riparian grants, which would be burdensome and counterproductive if imposed as requirements for the filing of a tidelands claim under the constitutional amendment. *Ante* at 78–79.

against the conclusion that the Legislature recognized, and the people of the State understood, that a sound and reasonable exercise of governmental discretion under the amendment could encompass the affirmative decision to use the existing tidelands map, subject to appropriate conditions, as the basis for the State's riparian claims.

In reaching a contrary result, the majority in my view has misapplied and misused the statements attributed to various individuals in the course of the enactment and adoption of the amendment. *Ante* at 83, 84–85. Most of these individuals were concerned that the amendment, if adopted, might be construed as mandating the use of the meadowlands mapping act, *N.J.S.A.* 13:1B–13.1 *et seq.* as the exclusive method for the assertion of the State's riparian claims. They also assumed that the existing tidelands map, P–13, would not be judicially approved as a claims methodology. If the amendment were construed and applied in that way, they believed that the State could not possibly assert riparian claims within the one year period allowed by the amendment. Such a judicial interpretation, they reasoned, would result in the automatic forfeiture of State tidelands. Consequently, some of these individuals urged that the amendment should not be adopted.

This partisan position based upon one possible interpretation of the amendment does not define either the purpose of the constitutional amendment or the intent of the people in adopting it.[2] As conceded by the Court, there is no empirical basis for

---

[2] Administration officials testified at the two public hearings (*Public Hearings on ACR–3037 and SCR–3023 before the Senate Judiciary Committee and Assembly Judiciary, Law, Public Safety and Defense Committee,* June 5, 1981; *Public Hearings on ACR–3037 and SCR–3023 before the Subcommittee of the Assembly Agriculture and Environment Committee,* July 23, 1981) regarding the interpretation and effect of the proposed constitutional amendment. These opinions should be accorded no determinative weight in ascertaining legislative intent of the amendment, absent an indication of an adoption of such expressions as the views of the framers or the adopters of

the conclusion that the amendment as propounded and adopted designated the meadowlands mapping act as the exclusive method to present State riparian claims. Indeed, there is no basis to impute an intent on the part of those who propounded and endorsed this constitutional amendment that any single existing methodology was to be the exclusive mode for defining and asserting the State's riparian claims to the subject tidelands.

We are therefore remitted to an interpretation of the constitutional amendment that will impute to the people who adopted this organic change an intention that serves to effectuate fully and fairly its overriding purpose. *Vreeland v. Byrne,* 72 *N.J.* 292, 302 (1977). Our task is to find the true and sensible meaning of the constitutional provision. *Lloyd v. Vermeulen,* 22 *N.J.* 200, 206 (1956). We must be mindful that "[t]he Constitution was made to serve and protect the people of the State and all of its language must be sensibly construed with that uppermost in mind." *Kervick v. Bontempo,* 29 *N.J.* 469, 480 (1959).

The key to our interpretive mission is to identify and define the *purpose* of the constitutional amendment. That purpose is accurately recapitulated by the Court:

> The State must not only delineate the former tideland, but also should alert those having an adverse interest. That warning is necessary to fulfill a major purpose of the Amendment, namely to relieve property owners from State ownership claims that may or may not be valid. Sometimes it is difficult to determine whether land ever had been flowed by the tide and, unless the State acted affirmatively, owners would be uncertain indefinitely if the State "has a claim to the land." *Gormley v. Lan,* 88 *N.J.* 26, 35 n. 2 (1981). A claim made in good faith by the State notifying the property owner is all that is required. [*Ante* at 80 (footnote omitted).]

I believe the presentation of riparian claims under the aegis of P–13 clearly and reasonably fulfills the constitutional purpose of the amendment. As stated aptly and concisely by Judge Michels:

---

the amendment. 2A *Sutherland, Statutory Construction,* § 48.10 at 210 (4 ed. Sands 1973); *State v. Exxon Corp.,* 151 *N.J.Super.* 464 (Ch.Div.1977).

At best, the result of the State's asserting its claim [under any map adopted, including P–13] will be notice of potential claim to those whose lands are claimed, and repose to those whose lands are passed over. Uncertainties of title will not be resolved, and owners will not be relieved of competing claims, until the State's title is actually litigated and judicially determined. Thus, the most the people could have intended the amendment accomplish is fair notice to landowners that their land might, subject to judicial determination, be subject to State claim and ownership. * * * [T]he people of New Jersey did not intend arbitrarily to cut off an efficient mapping program, near to completion, and give up their claim to thousands of acres of land devoted to their public schools. Rather, the legislative history suggests that the amendment was intended to give relief to the landowner who is uncertain of the status of his land and must either "sue the state and attempt to acquire the title or ... purchase a grant from the state." [187 *N.J.Super.* at 261 (citation omitted).]

Thus, the good faith application of P–13 as the initial assertion of riparian claims contemplated by the amendment provides both fair notice and repose to impacted property owners and clearly sets the stage for the definitive, ultimate determination of tidelands ownership.[3]

What is perplexing about the majority's decision is that it embraces untoward consequences that can be avoided without subverting the constitutional purpose or doing violence to the language of the amendment. As earlier noted, one such consequence is the forfeiture of State lands. Another derivative consequence is the permanent loss of public educational funds that would be generated from the proceeds of the disposition of

---

[3]David Moore, Chairman of the Tidelands Resource Council, testifying at the trial, rejected the use of P–13 as a State claim as "irresponsible" because the State eventually might abandon many of the properties claimed on the map. He felt the meadowlands mapping procedure was more efficient in this respect. However, no particular mapping technique avoids litigation in quieting title. The subsequent post-mapping need to settle and determine actual ownership is unavoidable regardless of which mapping technique is used and, therefore, does not *per se* disqualify and invalidate the use of P–13 as a claims instrument. Regardless of which maps are used to comprise State claims, resolution of contested ownership continues to necessitate individual quiet title actions. This is acknowledged in *City of Jersey City v. Tidelands Resource Council*, 95 *N.J.* 100 (1983) where the Court today approves the State's right to adjust claim lines according to the availability of new evidence before engaging in any controversy involving a particular piece of property.

such forfeited riparian lands. Indeed, as to the latter, the interpretive statement that was approved by this Court and used on the ballot in the general election in which the amendment carried provided in certain terms:

> When the State establishes ownership of tidal flowed land, any proceeds from the sale of the land are deposited in a fund devoted to public education. [*Gormley v. Lan,* 88 *N.J.* at 35, n. 2.]

These consequences—the immediate forfeiture of State tidelands and the permanent loss of public school funds—are not dictated by either the purpose or the language of the constitutional amendment and do not reflect a reasonable intent of the voters.

It is a "golden rule" of interpretation, fully applicable to constitutional as well as statutory documents, that the unreasonableness of a particular result arising from the selection of one among several possible alternative interpretations strongly militates in favor of the adoption of an interpretation that embraces a reasonable result. 2A *Sutherland, Statutory Construction* § 45.12 at 37 (4 ed. Sands 1973); *Clifton v. Passaic Cty. Bd. of Taxation,* 28 *N.J.* 411, 421 (1958) ("A construction 'calling for unreasonable results will be avoided where reasonable results consistent with the indicated purpose of the act as a whole are equally possible,'" quoting *Elizabeth Federal Savings & Loan Ass'n v. Howell,* 24 *N.J.* 488, 508 (1957)); *see Kervick v. Bontempo, supra,* 29 *N.J.* 469.

Judge Simpson in the trial of this case noted that the State's "[c]laims have to date been fully delineated [on P–13] as to areas covered by 767 photomaps," and he stressed that "all remaining claims will have been specifically defined and asserted pursuant to law by November 2, 1982 and *fully delineated* by December 31, 1985 . . . ." 187 *N.J.Super.* at 340 (emphasis added). Consequently, he incorporated this mapping schedule as a condition for the State's use of P–13 as the basis for the State riparian claims. *Id.* at 340–41. Judge Michels endorsed, as would I, the

order entered by Judge Simpson, which was designed to expedite the presentation and perfection of the State's claims under P-13. 187 *N.J.Super.* at 263-64. While Judge Michels did not specifically reiterate Judge Simpson's order incorporating the mapping schedule with its December 31, 1985 deadline, I am satisfied that this schedule is an appropriate and necessary measure and would affirm its inclusion.

Furthermore, the discretionary use of the existing tidelands map, P-13, as a method for presenting the State's riparian claims does not render the constitutional amendment meaningless. It does not signify that the State would not be doing "more than it had already done," as suggested by the Court. *Ante* at 83. The majority fails to stress the point we underscored in *Gormley v. Lan,* 88 *N.J.* 26 (1981) that the amendment imposes a forty year time bar to State claims to land previously perpetually vulnerable to such claims.

> The amendment sought to bar all State claims to land not flowed by the tide for the past 40 years. The prior law, by contrast, subjected lands to the State's claim no matter how ancient the tidal flow over that parcel may have been, or put differently, no matter how long the land had been dry. [*Id.* at 30.]

The amendment forces the State's hand; it mandates that the State go forward and affirmatively assert its riparian claims. The use of P-13 accomplishes this purpose, as it serves to identify properties that would otherwise be indefinitely exposed to ownership claims by the State. It also effectively identifies properties that are eliminated from any possible State claims of ownership.

The trial court's adjudication of the issues and the relief it granted constitute a valid and responsible exercise of judicial power. This disposition represents injunctive relief in the nature of *mandamus*—relief that is required to compel the exercise of governmental discretion where there is a duty to act, but the court is confronted with inaction borne of official confusion, indifference or intransigence. *See Switz v. Middletown Tp.,* 23

*N.J.* 580, 587–91 (1957). Ordinarily, the Court will not determine the manner in which discretionary authority shall be exercised. *Gallena v. Scott,* 11 *N.J.* 231, 238 (1953). It may do so, however, when governmental inertia imperils interests of significant constitutional magnitude. There must be an appropriate and effective judicial response when a constitutional imperative is to be addressed, a constitutional objective attained, or a constitutional calamity averted. *Id.; South Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp.,* 92 *N.J.* 158 (1983); *Robinson v. Cahill,* 69 *N.J.* 133 (1975), *cert.* den., 423 *U.S.* 913, 96 *S.Ct.* 217, 46 *L.Ed.*2d 141 (1975), vacated on other grounds, 69 *N.J.* 449 (1976).

Here, the court was faced with governmental inaction attributable to official confusion or misunderstanding as to the dictates imposed by the constitutional amendment. Sufferance of such a governmental refusal to act would mean the abnegation of the will of the people. The Court would be derelict if it were to tolerate this constitutional nullification. The injunctive application of the existing tidelands map, P–13, under the constitutional amendment, subject to the strict acceleration of the final mapping procedures, is a modest, reasonable, and circumspect exercise of the Court's remedial powers, wholly justified by the overriding constitutional goals that it preserves.

*For reversal in part; affirmance in part*—Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, POLLOCK, O'HERN and GARIBALDI—6.

*Dissenting in part*—Justice HANDLER—1.